Syllabus.

---

THE J. W. BUTLER PAPER COMPANY *et al.*

*v.*

BURR ROBBINS *et al.*

AND

THE J. W. BUTLER PAPER COMPANY *et al.*

*v.*

EMMA J. JEFFERY.

*Filed at Ottawa, September 8, 1894.*

1. CORPORATIONS—*insolvent corporation—bill to wind up its affairs—jurisdiction.* Where a private corporation, organized under the act of 1872, ceases business, leaving debts unpaid, a court of equity will have jurisdiction of a bill filed by a party who is both a stockholder and creditor, to wind up the affairs of the company, under section 25 of that act. The statute gives a remedy in the nature of a creditor's bill, and is designed to aid creditors in the collection of their debts.

2. SAME—*right to prefer creditors.* It is the settled law of this State that corporations may prefer creditors. Their corporate property is not held in trust in such sense as to forbid the corporation from giving judgment notes, confessions of judgments or mortgages, or doing any other matter or thing in the exercise of the right they have to prefer one creditor to another.

3. SAME—*exercise of right to prefer creditors—good faith of officers.* The persons to whom the corporation intrusts the exercise of its right to prefer creditors, must exercise the trust in the utmost good faith, without regard to the extent of their personal interest in the corporation or its property; and the fact that the corporation may be embarrassed with debts or may be well nigh or wholly insolvent, will not lessen the duty to exercise with fairness the power given them. They represent the corporation.

4. Such agents or officers of a corporation have no right to join hostile creditors or hostile stockholders in a raid upon the corporation, or upon the corporate property; and incitement to adverse action is not less inconsistent with their duties. Their attitude must be at all times on the side of the corporation, otherwise they cease to represent it.

5. SAME—*power to borrow money.* Power given by a corporation to its president to borrow money, and secure its repayment by judgment notes or otherwise, should be construed with strictness. The power to bor-

row money will not embrace the power to buy stock in the corporation, or other corporate stocks, or printing presses, paper and other materials for the company.

6. SAME—*setting aside judgments obtained by fraud of officers.* Where a president of a private corporation, who held a controlling share of the stock, was empowered to borrow money, as the agent of his wife sold her stock to the company, and gave her judgment notes payable on demand, upon which judgment was confessed in favor of the wife, under which all the corporate property was sold, and the proof showed that the president in such transaction was seeking to break down the company, and transfer such property fraudulently to his wife, and had conspired with the secretary to wreck the corporation, it was held that the sales of the corporate property under the judgments confessed, were properly set aside on the bill of stockholders and creditors filed for that purpose.

7. INSOLVENT DEBTORS—*creditor accepting preference.* Creditors may accept preferences, but not in consideration of promises, express or implied, to further the plans of the debtor to hinder, delay or defraud other creditors. The law favors the diligent and active creditor, but it warns him that he can enter into no bargain or plan, the object of which is not the collection of his own debt solely, but in part the defeat of some one else equally worthy with himself.

APPEAL from the Appellate Court for the First District; —heard in that court on appeal from the Superior Court of Cook County; the Hon. M. F. TULEY, Judge, presiding.

Messrs. McCLELLAN & CUMMINS, for the J. W. Butler Co., plaintiff in error and appellant, and Mr. R. A. CHILDS, for Albert Hayden, the plaintiff in cross-error.

The facts shown constitute, in law, not only badges of fraud, but actual proof of fraud, and fully sustain the findings of the decree as to a fraudulent scheme and conspiracy. Bump on Fraud. Convey. 31–33; *Sand* v. *Codwin,* 4 John. 536; *Rothgerber* v. *Gough,* 52 Ill. 436.

The judgment and proceedings had thereon being collusive, and having been for the purpose of defrauding the creditors of the John B. Jeffery Printing Company, as to these, they are utterly void. *Earl of Brandon* v. *Becker,* 3 Clark & Finnely, 510; *Bates* v. *Winsted,* 77 N. C. 238;

*Henderson* v. *Lacon*, L. R., 5 Eq. 249; Freeman on Judgments (3d ed.), sec. 250.

The plea of fraud in obtaining the judgment relied on by the opposite party is good in favor of third persons whose rights have been affected by the judgments. This is certainly true in the case of creditors and others seeking to impeach the judgment for fraud upon themselves. Bigelow on Estoppel (4th ed.), 210; Bump on Fraud. Convey. 521; *Field* v. *Flanders*, 40 Ill. 470; *Carr* v. *Minor*, 42 id. 179; *Kirby* v. *Fitzgerald*, 31 N. Y. 417; *Hall* v. *Hamlin*, 2 Watts, 354; *Thompson's Appeal*, 57 Pa. St. 175; *Lewis* v. *Rogers*, 16 id. 18; *Gaines* v. *Rolf*, 12 How. 537; *State* v. *Little*, 1 N. H. 257.

As to the evidence of a conspiracy, see: 3 Greenl. on Ev., secs. 93, 94 and 111; 1 Phillips on Ev., marg. pages 494, 495, and notes; also 774–777.

The grantee of the debtor's estate, in a transaction to defraud creditors, is held as a trustee of the creditors, and must surrender the trust property, or the proceeds, or account for its value or the proceeds. Bump on Fraud. Convey. 608, 616, 605.

The proceeds may be followed, and any property in which it has been invested, so far as it can be traced. The grantee is liable for property which he has converted to his own use. If he sells the property, and receives insufficient security, the loss falls upon him, and not upon the creditors. Id. 609; *Robinson* v. *Boyd*, 17 Mich. 128; *Tams* v. *Richards*, 26 Pa. 97; *Gittelle* v. *Bate*, 86 N. Y. 87.

The president of a corporation can only bind the corporation by such contracts as come within its most ordinary routine business. Taylor on Corp., sec. 236; 1 Waterman on Corp., sec. 126.

The acts of the officers and agents of a corporation are binding only so far as they are within the scope, usage, practice and course of business of the corporation. Taylor on Corp., secs. 191, 192; Waterman on Corp., sec. 126.

It has been held, that all persons dealing with corporations are chargeable with notice of its by-laws. Taylor on Corp., sec. 196, and cases cited; *Hayden* v. *Ins. Co.*, 80 Va. 683.

The directors of a corporation have no power to alienate property essential to the transaction of the company's business. *Holder* v. *Lafayette R. R. Co.*, 71 Ill. 106; *Rollins* v. *Clay*, 33 Me. 132; *Abbott* v. *Am. Hard Rubber Co.*, 33 Barb. 87; *Bedford R. Co.* v. *Bowser*, 48 Pa. St. 29; *Taylor* v. *Miami Export Co.*, 5 Ohio, 162; 19 Central Law Journal, 305–310; 18 id. 130; Field on Corp., sec. 151; Taylor on Corp., sec. 229.

Nor have they power to destroy the corporate existence, or give away its funds, or deprive it of its means to accomplish the full purpose for which it was chartered. *Union Mutual L. Ins. Co.* v. *Frear Stone Mfg. Co.*, 97 Ill. 537; *Burke* v. *Smith*, 16 Wall. 369; *Prescott* v. *Dunn*, 39 Me. 587; Green's Brice's Ultra Vires, secs. 229, 230; Morawetz on Corps., sec. 582; Field on Corps., sec. 151; Taylor on Corp., 668; *Robbins* v. *Embry*, 1 S. & M. 207–258–264; *Epprehett* v. *Nicholson*, 4 Corp. Cas. 138.

The power of the president to execute the notes and warrants of attorney must be strictly construed. *Frye* v. *Jones*, 78 Ill. 627; Ewell on Agency, 147, 204.

The president of a corporation has not, by virtue of his office, power to confess a judgment against the corporation, or to execute a warrant of attorney, authorizing another to do so. *Joliet Electric Light & P. Co.* v. *Ingalls*, 23 Ill. App. 50; *Adams* v. *Crosswood Ptg. Co.*, 27 id. 313; *Stokes* v. *N. J. Pottery Co.*, 46 N. J. L. 237.

The J. W. Butler Paper Company, the complainant, as a creditor and stockholder of the John B. Jeffery Printing Company, had a right to bring and maintain its bill under sec. 25, ch. 32, of the Illinois statute, and the court had jurisdiction of the same. *St. L., etc., Co.* v. *Sandoval, etc.,*

*Co.,* 116 Ill. 170; *Same* v. *Same,* 111 id. 32; *Same* v. *Edwards,* 103 id. 472.

The complainant, as a creditor and stockholder of the John B. Jeffery Printing Company, had a right to bring its bill to prevent the fraudulent misapplication, waste and destruction of the property and assets of the said company, and the case stated by the complainant in its bill and supplemental bill, and in the cross-bill of Hayden and Cottrell & Sons, and in the supplemental cross-bill of Hayden, is within the ordinary and unquestioned jurisdiction of the court. *Baldwin* v. *Caufield,* 26 Minn. 43; Taylor on Corporations, sec. 662, and cases cited; 2 Waterman on Corporations, 578; *Otis* v. *Gardner,* 105 Ill. 436.

Creditors at large may pursue assets of a corporation fraudulently transferred when all property of the corporation has been transferred. *Hibernia Ins. Co.* v. *St. Louis Transf. Co.,* 13 Fed. Rep. 516; *Same case,* 10 id. 599.

Creditors may sustain a bill to prevent the misapplication of funds of a corporation, and may prevent waste and diversion of corporate property. Taylor on Corporations, secs. 651, 654, 655.

If there ever existed any question as to the jurisdiction of the court to entertain the bill, objection on that ground has been waived by the answers of the defendants and their submission to the jurisdiction of the court. *Stout* v. *Cook,* 41 Ill. 447; *Hickey* v. *Forristal,* 49 id. 255; *Magee* v. *Magee,* 51 id. 500; *Dodge* v. *Wright,* 48 id. 382; *Knox Co.* v. *Davis,* 63 id. 411; *Comstock* v. *Henneberry,* 66 id. 215; *Gage* v. *Griffin,* 103 id. 41; *Ohling* v. *Luitjens,* 32 id. 23; *Chic. Theo. Sem.* v. *Gage,* 103 id. 175; *Day* v. *Washburn,* 24 How. 352.

Messrs. Cratty Bros. and Ashcraft, for Burr Robbins, defendant in error:

The capital stock of an incorporated company is a trust fund set apart for the payment of its debts. It is a substi-

tute for the personal liability which subsists in private partnership. *Sanger* v. *Upton*, 91 U. S. 60; *Clapp* v. *Peterson*, 104 Ill. 26.

The recovery of a judgment against a corporation establishes conclusively the plaintiff's right to satisfy the judgment out of any assets belonging to the corporation, and its validity can not be impeached by creditors or stockholders, except for causes such as fraud which a corporation itself could urge against it. Morawetz on Corporations, sec. 865; *Millard* v. *St. Francis, etc.*, 8 Bradw. 341; *Joliet* v. *Ingalls*, 23 Ill. App. 45; *Adams* v. *Crosswood Printing Co.*, 27 id. 313.

Mere contract creditors can not have standing in equity to attach judgments against a common debtor. *Dormueil* v. *Ward*, 108 id. 216.

Even an insolvent corporation has a right to prefer its creditors, and to secure such as it may see fit. Morawetz on Corporations, sec. 802; *Catlin* v. *Eagle Bank*, 6 Conn. 233; *Reichwald* v. *Com. Hotel Co.*, 106 Ill. 439.

Mr. A. W. GREEN, for the defendant in error, Tenney.

The J. W. Butler Paper Company had no standing in a court of equity to maintain a bill to wind up the corporation. Such a suit can only be brought after the recovery of judgment, and the return of execution unsatisfied, especially if its object be to set aside prior transfers of property by the company alleged to be fraudulent. *Patterson* v. *Lynde*, 112 Ill. 204; *Greenway* v. *Thomas*, 14 id. 271; *Bigelow* v. *Andress*, 31 id. 323; *Dewey* v. *Eckert*, 62 id. 220; *Dormueil* v. *Ward*, 108 id. 219; *Baker* v. *Backus*, 32 id. 98; *Taylor* v. *Bowker*, 111 U. S. 110; *Terrey* v. *Anderson*, 95 id. 628; *U. S.* v. *U. P. R. R. Co.*, 98 id. 569; *Hatch* v. *Dana*, 101 id. 208; *Catlin* v. *Eagle Bank*, 6 Conn. 233; *Adler* v. *Mil. Pat. Man. Co.*, 13 Wis. 63; *Webster* v. *Clark*, 25 Me. 313; *Treadwell* v.

*Salisbury Manf. Co.,* 73 Mass. 393; *Cambridge Water Works* v. *Somerville, etc.,* 86 id. 239; *Cole* v. *Life Ins. Co.,* 23 Hun, 255; High on Receivers, sec. 301; Morawetz on Corporations, sec. 860.

Independent of positive law, all corporations have the absolute right of *jus disponendi,* neither limited as to objects nor circumscribed as to quantity. A corporation may contract debts, borrow money, execute negotiable paper, give mortgages, and turn out all its property for the payment of a part only of its obligations. If the corporation has received the benefit, the stockholders are estopped to deny authority to give the security or to make the transfer. *Agrl. Society* v. *Paddock,* 80 Ill. 265; *West* v. *Madison Agr'l Board,* 82 id. 205; *Reichwald* v. *Com. Hotel Co.,* 106 id. 439; *Ward* v. *Johnson,* 95 id. 238; *Badger* v. *Batavia Paper Co.,* 70 id. 302; *Marshall Co.* v. *Cook,* 38 id. 50; *Galena* v. *Corwith,* 48 id. 423; *Bradley* v. *Ballard,* 55 id. 413; *Chicago Building Society* v. *Crowell,* 65 id. 453; *P. & S. R. R.* v. *Thompson,* 103 id. 187; *Thomas* v. *Ry. Co.,* 104 id. 462; *O. P. R. R. Co.* v. *Murray,* 15 id. 336; *Graham* v. *Railroad Co.,* 102 U. S. 160; *Tyler* v. *R. F. Co.,* 30 W. Va. 123; *Barns* v. *Ontario Bank,* 19 N. Y. 152.

If the indebtedness was valid, the defendants in error had a right to enter judgment on the notes. If confessed without authority, the judgments were voidable merely, and may be ratified by a majority of the stockholders or directors. The corporation alone could complain, and very slight proof would be required to show confirmation. *Martin* v. *Judd,* 60 Ill. 78; *Sherman* v. *Fitch,* 98 Mass. 56; *Herrod* v. *McDaniels,* 126 id. 415; *St. James* v. *Railway Company,* 141 id. 500; *Kelley* v. *Railway Company,* id. 496.

The note of the First National Bank authorized the entry of judgment at any time after date, and the entry of judgment before maturity was the exercise of an unques-

tioned legal right. *Martin* v. *Judd,* 60 Ill. 78; *Sherman* v. *Baddely,* 11 id. 622; *Adam* v. *Arnold,* 86 id. 185; *Thomas* v. *Mueller,* 106 id. 36.

The other notes upon which judgments were shown to have been entered were given for a valuable consideration, and were all payable on demand. The note of the W. O. Tyler Paper Company was given to secure contingent liability, but that does not affect the validity of the judgment. It is the legal duty of the corporation to pay matured obligations, and its right to pay such as had not matured, with the creditor's consent. *Sprague, etc., Co.* v. *Murphy, etc., Co.,* 26 Fed. R. 572; *Goodheart* v. *Johnson,* 88 Ill. 58; *Van Wyck* v. *Seward,* 28 Wend. 375; *Norton* v. *Whiting,* 1 Paige, 578; *Monell* v. *Smith,* 5 Cow. 441; *Roosevelt* v. *Mark,* 6 Johns. Ch. 266; *Wilder* v. *Fondey,* 4 Wend. 100; *Spencer* v. *Ballou,* 18 N. Y. 330; *Ludlow* v. *Hurd,* 19 Johns. 218.

Had the note to Mrs. Jeffery been made payable to John B. Jeffery, while president of the company, it would have been valid if the indebtedness was *bona fide. Merrick* v. *Coal Co.,* 61 Ill. 479; *Harts* v. *Brown,* 77 id. 226.

The orders of the court authorizing and confirming the sale of the property were final, and were binding upon the parties to this suit, and upon the court, until reversed upon appeal. *First National Bank* v. *Shedd,* 121 U. S. 74; *U. S.* v. *Throckmorton,* 98 U. S. 64, 68; *Graham* v. *Railway,* 118 U. S. 161, 176; *Thompson* v. *Maxwell,* 95 U. S. 391; *Penn. Trans. Co.'s Appeal,* 101 Pa. St. 576; *Greene* v. *Greene,* 68 Mass. 361.

The fact that the property was purchased by the trustee for the judgment creditors, and the purchase money applied in discharging judgment liens upon it, and that the bulk of the property was subsequently transferred to the corporation organized for the purpose of purchasing the same, and continued the business of the old company, is no evidence of bad faith or unfair dealing. *Jewell* v. *Rock River Paper*

*Company*, 101 Ill. 57; *Gray* v. *National Steamship Co.*, 115 U. S. 116.

Where the property of the corporation is not more than sufficient to pay its debts, the stockholders have no pecuniary interest in its assets. *Bayliss* v. *Railway*, 8 Biss. 195; 2 Mor. on Corporations, sec. 787.

The complainant being a mere contract creditor, with no lien upon the property of the corporation, could not, either in a court of law or equity, assert any claim against the alleged conspirators for making a fraudulent disposition thereof. *Klaus* v. *Hennessey*, 13 R. I. 335; *Lamb* v. *Stone*, 11 Pick. 527; *Adler* v. *Fenton*, 24 How. 407, 412; *Smith* v. *Blake*, 1 Day (Conn.) 258; *Austin* v. *Barrows*, 41 Conn. 287; *Moody* v. *Burton*, 27 Maine, 427; *Kimball* v. *Harman*, 34 Md. 407; *Green* v. *Kimble*, 6 Blackf. 552; *Wellington* v. *Small*, 3 Cush. 145; *Bradley* v. *Fuller*, 118 Mass. 239.

Messrs. Barnum, Evans & Barnum, for the appellee and defendant in error, Emma J. Jeffery:

For points and authorities see brief of A. W. Green, for Mrs. Jeffery.

Mr. R. A. Child, for Albert Hayden:

Equity will take jurisdiction to rescind a contract that has been procured by fraud. Pomeroy's Equity Jurisprudence, 110, 112; *Wilson* v. *Haecker et al.*, 85 Ill. 349; *Bradley et al.* v. *Luce et al.*, 99 id. 234; *Baker* v. *Rockabrand*, 118 id. 365, and cases cited; *Preston et al.* v. *Spaulding et al.*, 120 id. 208.

*Statu quo* as to the defrauding party is not a necessary incident to the relief of rescission when the defrauding party has placed it beyond the power of the defrauded party to restore; but the law will rescind and leave the culpable party where his own perfidy has placed him. *Masson* v. *Bovet*, 1 Denio, 69.

So also has a court of equity concurrent jurisdiction with a court of law to decree the repayment of money procured by fraud. *Hill* v. *Lewis*, 11 L. R. Eq. 215. (Citing the case of *Evans* v. *Bicknell*, 6 Ves. 174.)

False statements made in a prospectus of a corporation as to its assets, relied upon by the purchaser, will avoid a contract for the purchase of capital stock in the company. *Henderson* v. *Lacom*, 5 L. R. Eq., 257, 604; *Smith* v. *Ress R. Co.*, 2 L. R. Repts. 268; *Oaks* v. *Tarquant*, id. 325.

Property transferred to a corporation in payment of its capital stock, must be of the full cash equivalent. *Boynton* v. *Hatch*, 49 N. Y. 225; *Crandall* v. *Allan Lincoln et al.*, 52 Conn. 73.

Messrs. Grosscup & Wean, for C. B. Cottrell & Sons.

Mr. Justice Baker delivered the opinion of the Court:

On the 19th day of May, 1886, certain judgments by confession were entered in the Superior Court of Cook county against the John B. Jeffery Printing Company of Chicago. On these judgments, which were six in number, executions were immediately issued. Three of them were levied at once on all of the personal property of the company, and the other three were returned, the next morning, no property found; and the plaintiffs therein forthwith filed creditors' bills, in the same court, against the company, and procured the appointment of a receiver, who, with the consent of the other judgment creditors and the sheriff, took possession of the company's property. Eleven days after the entry of these judgments, namely, June 1, 1886, the J. W. Butler Paper Company, claiming to be a creditor and stockholder of the printing company, filed its bill in chancery in the said Superior Court, against the printing company, the judgment creditors and others, charging certain of the defendants with a conspiracy to wreck the printing company and to defraud creditors thereof.

In the complainant's bill and in the supplemental bill, the cross-bills, amended cross-bill and supplemental cross-bill, subsequently filed, these charges of fraud, condensed into a few words, were, that the printing company was brought into existence, was managed and controlled and was brought to its end, for the accomplishment of fraudulent purposes. It was claimed in said bills that the company's chief promoter, John B. Jeffery, procured its organization, not for legitimate business purposes, but as an instrumentality for obtaining credit and property for the enrichment of himself at the expense of others; that no money was paid to the company for capital stock; that the property transferred to it in payment for the whole of its capital stock was worth much less than one-half of the amount of the stock; that of the 1,500 shares of stock, of $100 each, 1,000 shares were issued to Jeffery, 400 shares to his wife, 97 shares to his father-in-law, and one share each to his brother-in-law, his book-keeper, and his attorney; that by divers representations and plans the stock held by his wife and her father was exchanged for real estate, and for printing presses, ink, paper and other materials, and that demand judgment notes, bearing eight per cent interest, were given to her by the company for the stock so exchanged, and that she soon became a creditor of the company to an amount exceeding one-third of the entire capital stock of the company, and that this indebtedness, so created in her, was, with other indebtedness, used to wreck and destroy the company and defraud creditors.

These charges of fraud, and the persons found to be guilty, and the measure of relief granted against them by the Circuit Court of Cook county, to which the litigation was transferred, require a full statement of the facts disclosed in the record. This is demanded, also, in view of the wide disagreement between the Circuit and Appellate Courts, touching not only the proofs of fraud, but also the

redress that should be granted against the guilty or supposed guilty parties.

In December, 1883, a fire occurred in the show printing establishment of John B. Jeffery, in Chicago. He was carrying, at the time, insurance to the amount of $87,000. He estimated the value of the property destroyed and damaged at $95,592.20, and although he claimed a total loss, he and the insurance companies effected a settlement, by which he was paid $66,500. Fifty thousand dollars of this money is said to have been given by him to his wife. To the property saved from the fire, supposed to be worth $29,092.20, he added, it is claimed, new materials and machinery of the value of $25,000, and soon afterward, namely, in February, 1884, set about organizing the John B. Jeffery Printing Company, with a nominal capital stock of $150,000. He had the tangible property he owned, which was worth $54,092.20, or the aggregate of the two sums of $29,092.20 and $25,000, appraised at $120,492.20. The good will of his business he valued at $50,000. The tangible property and the good will of the business were transferred by him to the company, the former at the valuation of $120,492.20, and the latter at a valuation of $35,000. The company, in payment for this property valued at $155,492.20, assumed debts of Jeffery to the amount of $5,492.20, and issued to him $100,000 in stock. The remainder of the stock was issued as follows: to Mrs. Jeffery, $40,000; to Robert J. Gay, $9,700; to Robert L. Gay, $100; to George T. Pomeroy, $100, and to J. W. Cothran, $100. The company was organized by the election of all of the stockholders, except Mrs. Jeffery, as directors. Jeffery was chosen president and treasurer, and Pomeroy secretary of the company. It is not claimed that any one, beside Mr. and Mrs. Jeffery, paid anything for stock, and although the books of the company show a payment to the company, February 20, 1884, of $50,000 for stock, it is not entered as paid by her, and on the same day

an entry of the payment of the same sum is made to Jeffery; but the latter claims that this sum was paid in by his wife for stock, and paid to him as the balance due him from the company on his transfer of the tangible property and good will, as above stated. The facts relating to this transfer of property by Jeffery to the company at a valuation alleged to have been grossly excessive, and to Mrs. Jeffery's payment or non-payment of $50,000 to the company, become important in the light of subsequent events, and will be further considered hereafter.

The John B. Jeffery Printing Company thus organized in February, 1884, with its stockholders, directors and officers as above named, at once began its show printing business, and carried on the same until May 19, 1886,—a period of two years and three months,—when it practically ceased to exist. Soon after its organization, and from time to time, the company had dealings with Mrs. Jeffery or in her name, consisting in loans of money by her to the company, but more frequently in transfers of stock by her to dealers directly or through the company, in exchange or as security for printing presses, ink, paper and other materials for the company. The aggregate of her loans or alleged loans, to the company, was $12,261.68, and of the 400 to 500 shares of stock she owned or represented, she transferred 150 shares to Albert Hayden for real estate, 50 shares to H. J. & W. E. Weber for ink, 76 shares to Cottrell & Sons on account of presses, 100 shares to Geo. H. Taylor & Co. for paper, and 100 shares to W. O. Tyler, trustee, also for paper. The total number of these shares was 476. Seventy-six of these shares came from her father, Robert J. Gay, and for all of the 476 shares, except those transferred to Hayden for real estate, she received from the company demand judgment notes, bearing eight per cent interest. These judgment notes authorized the entry of judgments thereon at any time after their respective dates. In this way, it will be seen, Mrs. Jeffery's relation to the company

was changed from that of a stockholder to that of a creditor. Her account with the company was adjusted from time to time, and new judgment notes given her and those previously given her surrendered. For instance, on the 31st day of December, 1884, after about ten months of business, she received a judgment note for $34,053.63. Nine months afterwards,—namely September 30, 1885,—she received a judgment note for $35,000. She received, November 4, 1885, for cash alleged to have been advanced by her to the company, its judgment note for $5,000. For the 200 shares of stock transferred to Taylor & Co. and the W. O. Tyler Paper Company, as above stated, she received from the company its judgment note for $20,000. On this note she subsequently received $5,000, and the note was surrendered May 14, 1886, and a new one for $15,000 issued to her, and on this note, May 19, 1886, she was paid all the money the company had in bank, which was $4,122.11. On the 19th of May, 1886, therefore, she held three judgment notes against the company,—one of September 30, 1885, for $35,000, one of November 4, 1885, for $5,000, and one of May 14, 1886, for $15,000; and on the first one there was due $36,780, on the second, $5,216, and on the third, $10,877.89, or on the three, the aggregate sum of $52,873.89. She owned now little or no stock. Her forty to fifty thousand dollars of stock had become demand judgment notes, bearing eight per cent interest, and on which was due, May 19, 1886, the above sum of $52,873.89.

The judgment notes given to Mrs. Jeffery were executed in the name of the company by her husband, its president, and presumably under a resolution adopted by the board of directors April 19, 1884, which authorized the president of the company to borrow not exceeding $50,000 at any one time, and secure the same by judgment notes, mortgages or otherwise. The first judgment note given Mrs. Jeffery was for the sum of $2,000, and bore date April 26, 1884. Like notes, for various sums, were given her from time to

time, as above stated, and the whole number received by her must have been not less than twelve to fifteen. They were given, it is claimed, for loans of money and sales of stock.

On the 14th of April, 1884, Albert Hayden sold and conveyed to Mrs. Jeffery certain real estate on Michigan avenue, between Thirty-first and Thirty-second streets, and received in payment therefor 150 shares of her stock, and five days afterwards Hayden became a director of the company in the place of Mrs. Jeffery's father, Robert J. Gay. The negotiations for the purchase of this real estate were carried on by Hayden and Jeffery, and the latter, to impress the former with the value of the stock, said in his letter to Hayden of April 1, that if he had not had faith in his business he would not have put back into it the solid cash received when he was burned out. In this letter other very flattering representations were made as to what the stock was or would be worth. He says: ''Before the fire in my office the stock would have paid an annual dividend of twenty-five per cent; with everything new and improved facilities, I am confident I can increase the business.'' In regard to the cash put back into the business after the fire, we may here remark that Mrs. Jeffery says that her husband gave her the greater portion of the money he received from the insurance companies.

Among the by-laws adopted by the directors or stockholders on the organization of the company, was one (No. 15) placing restrictions on sales of stock, and at the meeting of the board April 19, 1884, a resolution was adopted authorizing Mr. and Mrs. Jeffery to make such sales of stock as they might desire, and ratifying the sale of stock already made by her—no doubt the sale to Hayden. This ratification was made because the latter sale was made contrary to by-law 15. This resolution was adopted at the same meeting at which the resolution authorizing the president to borrow money was adopted. Jeffery's attorney drew these resolutions, and they appear to have been adopted before Hayden succeeded Gay as director,

which was at the same meeting. There was no other meeting of the directors until in March, 1885, and no meeting of stockholders from the first meeting in February, 1884, until February 1, 1886. Jeffery owned two-thirds of the stock and no doubt controlled seven-tenths of the other third. He was president and treasurer, and the two resolutions, just above referred to, changeable only by his consent, vested him practically with supreme power, and therefore Hayden's advent into the directory made no perceptible change in the management of the company. It was still the John B. Jeffery Printing Company.

Prior to May 1, 1884, Jeffery had some negotiations in Chicago with Edward A. Blake in regard to the purchase of printing presses. Blake was an agent of C. B. Cottrell & Sons, of New York. Jeffery went to New York, accompanied by his attorney, and on the first day of May called on Cottrell & Sons, and entered into a written contract with them for the purchase of five printing presses for $15,150, one-half thereof payable in cash upon the delivery and setting up of the presses, and the other half in stock of the John B. Jeffery Printing Company at par value. The contract provided, among other things, that the stock should not be put upon the market or sold for two years, and that Jeffery should have the option to purchase the stock at par value at any time within the two years. This contract was drawn up by Jeffery's attorney, who was also the attorney for Jeffery's company and a stockholder and director thereof, and who was in an adjoining room while Jeffery and the elder Cottrell were agreeing upon the terms of the contract. Jeffery called his attorney into the room, and the contract was written out by him as Jeffery gave him the supposed terms thereof. The attorney having business elsewhere, and but little time to remain longer at the office of Cottrell & Sons, the contract seems to have been somewhat hurriedly executed, the elder Cottrell contenting himself with a state-

ment of what he supposed it contained, and asking Jeffery if he was correct, and Jeffery answering that he was.

This is, in a few words, the version of what took place on that day, as given by Blake and three of the Cottrells. The testimony of these last named persons is to the effect that throughout the negotiations in Chicago and New York they had refused to take stock, in whole or in part, for their presses; that to own stock in printing companies would injure their business with other printing companies; that their business was the manufacture and sale of presses, and not the printing business; that their offer to Jeffery was for one-half cash and the balance in two years, with six per cent interest, without security; that Jeffery said the company had given no notes, and he did not want to begin giving notes; that they did not read the contract, but relied on what Jeffery said it was, his attorney desiring to attend to business elsewhere; that they supposed they were to hold the stock as collateral, without a note, for two years, with six per cent interest on the one-half of the purchase price of the presses, the stock to be taken up at the end of two years, if not sooner.

The Cottrells say they at once sent their contract to their manufactory in Rhode Island, and did not see the same again until near the expiration of the two years. About the time their debt became due, in the view they took of the matter, they called upon Jeffery to pay the balance remaining due for the presses and to take up his stock. He told them he was not bound to redeem the stock,—that he had an option to purchase it back at its par value at any time within the two years. Jeffery did not want the stock, neither did Cottrell & Sons. They insisted that they had been deceived by Jeffery, and cited as evidence thereof that they had told Jeffery they would not take stock in payment, and that they had offered to take a note with six per cent interest, due in two years, without security. George H. Bond, who had been assistant manager and assistant book-

keeper under Jeffery from January 2, 1883, to the end of the year 1886,—a period of four years,—testified that Jeffery referred to a certain form of contract *as his trick contract*, and that he had been told that Cottrell & Sons' contract was of that kind. Whether this is true or not, it is evident that Cottrell & Sons did not suppose their contract with the company was such as the writing of May 1, 1884, indicated. It will be observed here that if the Cottrells and Blake are to be believed, Jeffery's statement that he had given no notes, and did not want to give any, was untrue, for on the 26th day of April he had given his wife a demand judgment note, bearing eight per cent interest, for $2,000, and in the month of May he gave her three other demand judgment notes, bearing the same rate of interest, aggregating $7,000. Jeffery's refusal, therefore, to give Cottrell & Sons an ordinary unsecured note, payable in two years, with six per cent interest, must have been based on his desire to pay them with stock in his company.

On the 16th of May, 1885, the J. W. Butler Paper Company entered into a written contract with the John B. Jeffery Printing Company for the sale and delivery to the latter, within ninety days, of $10,000 worth of paper at the lowest market price. Upon the last delivery of paper the printing company was to give to the paper company its note for $10,-000, payable in two years, with six per cent interest, payable semi-annully, and as a security for the payment of the note, 100 shares of stock of the printing company were to be transferred to the paper company, which the latter might sell, on ten days' notice, when the note became due, but the paper company was to receive no dividends on the stock nor to have any right to vote the same for any purposes. The printing company was also required to give the other company the preference in its purchases of paper, from time to time, and to give it the business of other persons which the printing company might be able to control. In accordance with the terms of this contract the note and

stock were delivered by the printing company to the paper company on the 20th day of October, 1885, and the note bore date that day.    The paper company got little other business from the printing company, Jeffery giving as a reason therefor that he could do better with the W. O. Tyler Paper Company.

The W. O. Tyler Paper Company and the John B. Jeffery Printing Company, in April, 1886, exchanged their seven respective promissory notes, all dated March 5, 10, 16, 20, 25, 30 and April 5, 1886, for various sums, aggregating $22,758.50, and due, respectively, July 8, 13, 19, 23, 28 and August 2 and 8.    The seven notes received by the paper company were discounted by it at various banks in the city.    None of these notes were due at the time of the failure of the printing company.

Burr Robbins, a showman, and whose show printing had been done by Jeffery for a number of years, loaned or advanced to Jeffery's company, in December, 1885, $2,000 at one time and $3,000 at another time.    He received no note for the same, but it is claimed that Jeffery in compliance, perhaps, with a promise he had made Robbins, either on the 31st day of December, 1885, or at a later date, or on May 19, 1886, executed a judgment note to Robbins for the sum of $5,000.    This note was never delivered to Robbins, and, no matter when it was executed, it was in Jeffery's possession, and handed by him to Daniel K. Tenney, on the 19th of May 1886, when the judgments by confession were entered.

On or about the 6th day of February, 1886, the John B. Jeffery Printing Company borrowed of the First National Bank of Chicago the sum of $25,000, and gave therefor its promissory note, payable in ninety days, with a power of sale thereto annexed, authorizing it to sell the collateral deposited as security for the payment of the note, and this collateral was the two demand judgment notes, issued to Mrs. Jeffery September 30 and November 4, 1885, for

$35,000 and $5,000, respectively. These notes, so placed in the bank's possession as collateral, were endorsed by her without recourse. On the 8th day of May, when this note for $25,000 became due, it was renewed for the same length of time and secured with the same collateral; and eleven days afterward, when it was claimed that the affairs of the John B. Jeffery Printing Company had reached a crisis, this note was taken up and a demand judgment note for the same taken in its place. This latter transaction is denied, and it is claimed that the judgment note was taken May 8, when the first note became due, and not May 19, 1886. The collateral notes for $35,000 and $5,000 do not seem to have been surrendered, for alhtough endorsed by Mrs. Jeffery without recourse, judgments were entered on them in her name May 19, 1886, but it is said these judgments were at once assigned by her to the bank as collateral for the debt represented by the judgment entered on the bank's note for $25,000.

We have thus endeavored to show the relations sustained to the John B. Jeffery Printing Company by Emma J. Jeffery, Albert Hayden, C. B. Cottrell & Sons, the J. W. Butler Paper Company, the W. O. Tyler Paper Company, Burr Robbins and the First National Bank of Chicago, on the 19th day of May, 1886, when those confessions of judgment were entered against the printing company. Mrs. Jeffery had long ceased to be a stockholder, and had become a creditor to an amount exceeding the $50,000 of stock which she once owned or represented. Hayden had exchanged Michigan avenue property for 150 shares of her stock, and was charging such fraud as he seems to have supposed entitled him to the rights of a creditor. Cottrell & Sons claimed to be creditors to the amount of $7,600, but Jeffery said they were only stockholders. The J. W. Butler Paper Company had given two years' credit from October 20, 1885, for $10,000 worth of paper, and their collateral security was 100 shares of the same kind of

stock, from which were reserved, by the printing company, all dividends and right to vote. The W. O. Tyler Company received a demand judgment note from the printing company for $22,758.50, to protect it on its endorsement of those seven notes of the printing company, aggregating the said sum of $22,758.50. Burr Robbins had, in the hands of Jeffery, a note for $5,000, dated December 31, 1885, made then or on the 19th of May, 1886. The First National Bank held the printing company's demand judgment notes, bearing eight per cent interest, for $25,000, $35,000 and $5,000, to secure its loan of $25,000.

Hayden was a stockholder, and had been a director. He had talked a great deal and threatened considerably, but was not supposed to possess dangerous power. Cottrell & Sons supposed they were creditors, but on looking at their contract for the first time, two years after it was made, they found that they were more probably stockholders, and not creditors. The J. W. Butler Paper Company was giving no trouble, but was awaiting patiently the passage of the two years for which they had given credit. The other persons above named seemed to be secure and content, especially those to whom any debts were due, and who held demand judgment notes. The company's business had not been interrupted; its credit seemed to be good; its business was good; it was under the management of a very competent man. It had met with no considerable losses. At the close of its business, May 24, 1886, its books showed a total loss of only $3,136.22, from February 20, 1884, to May 19, 1886. Its chief danger undoubtedly was one of its own creation, namely, those demand judgment notes, but prior to May 19, 1886, no one but the bank and Mrs. Jeffery held any such notes. The bank was well secured, and could not have wanted its money ten days after renewing the loan for ninety days. Mrs. Jeffery controlled but one of these notes, the one for $15,000, made May 14, and considering Jeffery's well-nigh

exclusive management of his wife's affairs, no danger to the company could arise from this note, except as he suggested or advised action thereon. Robbins and the Tyler Paper Company held no such notes, or notes of any kind. Hayden and Cottrell & Sons could do nothing under section 25 of the act, under which the company, in which they held stock, was incorporated, for it had not ceased doing business, nor was there any apparent evidence that it contemplated the stoppage thereof. Hayden and Cottrell & Sons could sue, it is true, but their suits could be considered important only as their charges of fraud were well founded.

Late in the afternoon of May 19, 1886, in the said Superior Court, confessions of judgment were entered against the John B. Jeffery Printing Company, on the said six demand judgment notes, in favor of the following named persons and for the following named sums: Daniel K. Tenney, $25,100; Emma J. Jeffery, $38,611; Same, $5,266.50; Same, $10,977.89; Burr Robbins, $5,413.30; W. O. Tyler Paper Company, $22,758.50. On these judgments executions were immediately issued. Those issued on the three first judgments, aggregating $68,977.50 were levied at once upon all of the personal property of the defendant, one of whose employés the sheriff placed in possession as custodian. The executions issued on the other three judgments, aggregating $39,149.69, were returned the next morning, May 20th, no property found, and the plaintiffs therein, before noon, filed their creditors' bills. These bills charged the printing company with fraud and mismanagement, and prayed for a receiver, and were sworn to by Daniel K. Tenney. The court on the same day, and probably before noon, with the consent of the defendant, as expressed through its attorney, appointed George T. Pomeroy, the defendant's secretary, receiver. The receiver qualified at once, and, with the consent of the sheriff and the two judg-

ment creditors, whose three executions had been levied on the property, took possession of the property and plant. Jeffery, as president, and on behalf of the defendant company, made a written assignment of the property and effects of the company to the receiver. All this was done on the day succeeding the entry of the judgments. Orders of court were procured, and the receiver carried on the business as before, there being no interruption thereof. Contracts for work were completed, new ones made, and new materials purchased, indicating that the defendant's secretary would not run the business, as receiver, at a loss.

On the first day of June—eleven days after the entry of these judgments—the J. W. Butler Paper Company filed in the Superior Court its bill in chancery against the John B. Jeffery Printing Company, John B. Jeffery, Emma J. Jeffery, Robert J. Gay, Robert L. Gay, George T. Pomeroy, the First National Bank, Daniel K. Tenney, Burr Robbins, the W. O. Tyler Paper Company, Albert Hayden, Calvin B. Cottrell, the said receiver, the said sheriff, and others. This bill, as heretofore stated, charges John B. Jeffery with fraud in the organization and management of the John B. Jeffery Printing Company. It charges him and other persons with a conspiracy to wreck the company and transfer its property to a new company, and that to effect their fraudulent purposes they used certain indebtedness held against the company by persons to whom he had given the demand judgment notes hereinbefore described. The bill further sets forth many matters and things in relation to the organization and management of the company, tending to show fraud and misconduct, but it is not deemed necessary to recite them here. The complainant applied for and obtained, without notice, an injunction to prevent the sale of the property by the sheriff under the executions levied thereon, or by the receiver under order of court.

To this bill almost all of the defendants filed answers, and Hayden and Cottrell & Sons filed cross-bills, and thereupon

the judgment creditors entered their motion to dissolve the injunction. This motion was sustained and the injunction dissolved, and the receivership extended over complainants' bill or suit, and the court thereupon, June 29, 1886, entered an order entitled in the three following suits, "Emma J. Jeffery against the John B. Jeffery Printing Company," "J. W. Butler Paper Company against the John B. Jeffery Printing Company and others," and "Albert Hayden against the John B. Jeffery Printing Company and others." The court recites the receiver's possession of the property and effects of the defendant, as custodian of the sheriff, and the desirability of a sale of the property in bulk, and "*on motion of the complainant's solicitors,*" and with the consent of the judgment creditors, orders the sheriff to release forthwith the possession of the property to the receiver, absolutely, on the payment of his costs and charges, and the receiver to advertise for and receive bids for the property until ten o'clock A. M., July 6, and to sell to the highest bidder, subject to confirmation by the court, the property and plant of the defendant, its leasehold interests, good will, contracts for printing and other work entered into by the defendant or receiver, but not the outstanding accounts or money due the defendant or cash on hand; also, that the delivery of the property to the receiver should not affect the liens of the judgment creditors under their executions or creditors' bills, and that said liens should apply to the proceeds of the sale according to their several rights and priorities, which shall be subject to the final decree of the court; also, that if any of the judgment creditors should buy the property, they might deduct the amounts of their judgments from the purchase price and pay the excess to the receiver in cash, *upon giving* bonds conditioned for the payment to him of the amount of their bids not so paid in cash, if the court "shall finally decide that they were not entitled to receive that amount from said corporation."

This order for the sale of the property was made June 29, and July 6, D. K. Tenney made the following written bid:

"*George T. Pomeroy, Esq., Receiver:*

"DEAR SIR—As trustee for the First National Bank of Chicago, Emma J. Jeffery, Burr Robbins and the W. O. Tyler Paper Company, I bid for the purchase of all the property of the John B. Jeffery Printing Company, which you have advertised for sale, the sum of $75,000 applicable upon the judgments of said parties against said corporation in due priority.    Respectfully,

D. K. TENNEY, *Trustee.*"

This bid, the only one received, was reported to the court on the day of its date, and its confirmation moved by Tenney, and the court ordered that unless objections to the bid were filed by ten o'clock A. M. on the following Monday, the sale to him would be made absolute.    The sale was confirmed July 12, and July 15 the court ordered the $75,000 to be applied on the bank's judgment for $25,100, entered in the name of Tenney, and on the two judgments entered in the name of Mrs. Jeffery, for $38,619 and $5,266, respectively.    These last two judgments were those entered on the judgment notes of Mrs. Jeffery, endorsed by her to the bank without recourse, and as collateral security for its loan of $25,000.    This order also required these judgment creditors to enter into bonds in the sums respectively paid to them, "conditioned for the repayment of the said amounts to the receiver, in case the court should ultimately decree the repayment of the same, or any part thereof."

Tenney paid his bid by the release of the three judgments, which seem to have amounted to the following sums by the 6th of July, namely, $25,307.50, $38,913.66 and $5,348.86, and by releasing $4,204.73 on Mrs. Jeffery's judgment for $10,985.30, the execution upon which was not levied, but returned no property found.    These four sums so released, and the sum of $1,207.25, the receiver's costs and expenses, made the $75,000.

The bid for the uncollected accounts was from Tenney. It bears date July 21, 1886, and is as follows:

"*Dear Sir*—Having thoroughly examined the unpaid accounts, due and to become due the John B. Jeffery Printing Company, upon which the W. O. Tyler Paper Company, Burr Robbins and Emma J. Jeffery, as creditors, have liens by the filing of creditors' bills, I will give you for the entire amount of the accounts due and to become due said company, $28,000, which proposition, if accepted, will be performed by crediting the amount upon said judgments.              "Respectfully,

D. K. TENNEY, *Trustee.*"

Objections to the confirmation of the sale of the accounts to Tenney were filed July 26, but the sale was confirmed on August 4. This $28,000 was applied on the judgments of the W. O. Tyler Paper Company and Burr Robbins, leaving a balance due Robbins of $486.57, but it was subsequently ascertained that in the application of the $28,000 the proper priority of the judgments had not been observed, and a re-application was made, by which Mrs. Jeffery and Robbins were paid in full, and the Tyler Paper Company paid $15,652.52. No money was paid, but the credits given on these three judgments were $6,867.66, $5,479.82 and $15,652.52, and aggregated $28,000. The balance due the W. O. Tyler Paper Company appeared to be about $7,354.-20, and on this the receiver subsequently paid, out of other moneys in his hands, the sum of $3,766.27, which left a balance of about $3,587.96 still due that company on the winding up of the affairs of the John B. Jeffery Printing Company.

Within a few days after the confirmation of those sales to Tenney, and before the month of August, the John B. Jeffery Printing Company was succeeded by the "Jeffery Printing Company," with a capital stock of a like amount as that of the old company, namely $150,000, and on the

third day of August, Tenney made a written offer of sale to the new company, as follows:

"*Jeffery Printing Company, Chicago:*

"GENTLEMEN—I propose to sell to you the plant, machinery, fixtures, leasehold interest, material, uncompleted contracts and moneys accruing thereon, and all other property of the late John B. Jeffery Printing Company, as purchased by me from George T. Pomeroy, receiver, on the sixth day of July, 1886, for the sum of $175,000, and details, interest, etc., of said property may be seen on file in the Superior Court of Cook county, and by application to the receiver.          "Respectfully,

D. K. TENNEY, *Trustee.*"

The board of directors referred Tenney's offer to a committee, which the next day, August 4, reported that "they had taken the subject matter of such communication under consideration, and carefully examined and inspected the property, a schedule of which is appended to the report, and that they made a careful estimate and appraisal of the value of said property, and that they found the property to be worth $186,927.29; that the committee had had an interview with Tenney, trustee, and had offered him $150,-000 in cash for the property mentioned in his communication, which proposition was accepted by Tenney, and thereupon Tenney, trustee, executed a bill of sale to the Jeffery Printing Company of all the property enumerated in said proposition, and for which transfer Tenney was paid $150,-000, and that all of said property has been turned over to the said Jeffery Printing Company; that George T. Pomeroy was then in possession of the same for the company."

Efforts to form a new company had been made by Jeffery and Tenney within a few days after the entry of those judgments by confession, but the new corporation does not seem to have been organized until Tenney's title to the property and plant had been confirmed. The second sale to Tenney

was not confirmed until August 4. The committee which
made the appraisement found the presses of the establish-
ment running as usual, and its business going on as it had
gone on continuously from February, 1884, and do not seem
to have found or reported that the property and effects of
the concern August 3 were greater in quantity or value than
they were in May.

Jeffery's name was given to the new company, but it
seems to have been organized chiefly through the manage-
ment of Mr. Gage, of the First National Bank, who found
it expedient to co-operate in the arrangement, seeing that
thereby he could the more easily obtain the actual cash due
the bank on its original indebtedness for $25,000, which
had gone through so many transformations before realiza-
tion. We remark, however, that if the property purchased
by Tenney July 6, 1886, for $75,000 in judgments, and
sold by him August 4, 1886, for $150,000, was worth on
that day, upon "a careful estimate and appraisal," the sum
of $186,927.29, it is somewhat remarkable that a going
concern of such value could not be re-organized and made
into a new company without resort to the unusual and very
peculiar methods adopted by the bank and other co-operat-
ing parties.

Some eight or ten months after the organization of the
new company the litigation was transferred to the Circuit
Court of Cook county, and leave was given complainant to
file a supplemental bill, and to Hayden to file a supplemental
cross-bill. Prior to this time he had filed an amended cross-
bill. To these bills the Jeffery Printing Company, Lyman
W. Gage, and others who had organized the new company,
were made defendants. The charges of fraud in these sup-
plemental bills relate largely to the organization of the new
company, and are set forth with great fullness and partic-
ularity. The substance of them is, that before the entry
of those judgments by confession, Jeffery and others en-
tered into a scheme or conspiracy to use those demand

judgment notes for the acquisition of a lien on all the property of the company, and for its speedy transfer to a new corporation; that these notes were used, not so much for the collection of debts from the company, as for the seizure upon and transfer of its property and effects to a new company, to the injury and damage of creditors and stockholders of the old company; that for the success of said scheme certain creditors lent their active co-operation, and permitted its prime movers to use their demands for the futherance of their fraudulent plans, and that such creditors stood in no better light or attitude than those whose demands were without consideration or were fraudulent and void.

To these supplemental bills, joint and several and separate answers were filed, denying the charges of fraud and conspiracy, and the Jeffery Printing Company filed a plea setting forth at some length the proceedings had under the executions and creditors' bills, the sale and purchase of the property, the formation of the new company, and its extensive dealings with large numbers of persons in no way connected with the litigation, and that great injustice would follow an interference with its business or property. The case, therefore, came on for hearing in the Circuit Court, on the bill and supplemental bill of the J. W. Butler Paper Company, the cross-bill of C. B. Cottrell & Sons, the cross-bill, amended cross-bill and supplemental cross-bill of Albert Hayden, the answers of defendants, joint and several and separate, to these bills, replications to answers, and the plea of the Jeffery Printing Company to the supplemental bill of the Butler Paper Company. The evidence was taken in open court, before the chancellor, and a decree was rendered May 2, but entered as of April 18, 1889.

The decree contains a multitude of findings of fact, beginning with Jeffery's settlement with the insurance company in December, 1883, and his organization of the John B. Jeffery Printing Company in February, 1884. It finds

the charges of a scheme and conspiracy to defraud to have been proven by the evidence.   On this point the decree is full and specific as to persons and facts.   It finds that the entry of the six judgments by confession, May 19, 1886, and the proceedings based thereon, up to the formation of the new company, as they successively took place, were but parts of said scheme and conspiracy.   It further finds that the order for the sale of the property made June 29, 1886, "was made by the court upon the faith and in the belief that said judgments were valid and honest, and had not been entered up and obtained in pursuance of any collusion or fraudulent conspiracy upon the part of the said defendants;" that the judgments were not entered by the plaintiffs therein in the exercise of their rights, or for the purpose of collecting their debts, but were fraudulently and collusively entered, in pursuance of a scheme to wreck the said John B. Jeffery Printing Company, and to destroy the value of its stock, and to hinder and defraud the creditors of said company; "that it was never intended or expected that any one of the pretended debts, for which the judgments were confessed, was to be paid by or through such confessions of judgment, or by any legal proceeding to be had thereon, and that none of such judgments were in fact so paid."   It further finds that Jeffery, in the execution of his scheme, and in contemplation of subsequent apparent insolvency, in 1884 and 1885, exchanged 326 shares of his wife's stock for printing presses and paper, and that the eight per cent demand judgment notes issued to her were for the purpose of creating an apparent indebtedness to her, and that the effect of these transactions in stock was to increase the value of the plant, and to mass the indebtedness in the hands of his wife in such shape that it could be used at any time to put into execution his scheme and plan to wreck the company.   It finds that because of *laches* in filing the supplemental bill, not until ten months after the organization of the new company, and the transfer

to it of the plant and property of the old company, it would be inequitable as to innocent third persons to order the return of the property and plant to the receiver. It also finds that Hayden and Cottrell & Sons are not entitled to a rescission of their respective contracts, but orders their cross-bills to be retained for relief as stockholders, if, in the end, such relief could be properly granted on the coming in of the master's report, and the entry of the final decree. The decree contains findings in regard to all material facts in issue in the history and management of the John B. Jeffery Printing Company, from its organization in February, 1884, to its merger into the Jeffery Printing Company, August 3, 1886.

The court thereupon set aside and canceled the six judgments by confession, and ordered the proceeds of the sales of the tangible property, and of the accounts to stand in the place of the property and accounts, and adjudged the said proceeds as held in trust by the plaintiffs in the judgments, for the benefit of the corporation, its creditors and stockholders, and ordered them to pay to the receiver, within thirty days, the respective sums received by them on their alleged judgments, with six per cent interest thereon from August 10, 1886, for the use and benefit of the complainant, cross-complainants and other creditors and stockholders of the company, and distributable as the court might by decree direct.

It was further decreed that the complainant, the J. W. Butler Paper Company, recover of the John B. Jeffery Printing Company the sum of $11,796.67, to be paid *pro rata* with the debts due the other creditors, under the order of the court, out of the funds to be recovered in the suit. Tenney was required to account for all moneys paid to him by receiver Pomeroy, and Horatio L. Wait, master in chancery, was required to ascertain the amount of such moneys, and to ascertain all debts due and owing by the company on

the 19th of May, 1886, and all liabilities subsequently incurred.

The court found the liability of the printing company to the Tyler Paper Company, when the judgment in favor of the latter company was entered, was contingent, and not a debt for which the printing company could lawfully give, or the paper company lawfully receive, a judgment to the prejudice of the creditors and stockholders of the company, and that said liability, since the entry of said judgment, has been paid or discharged by the acceptance of the paper company of stock in the new corporation, styled the Jeffery Printing Company.

The court reserves, until the coming in of the master's report, the question of Mrs. Jeffery's rights, either as creditor or stockholder, and also the question as to whether the judgment entered in D. K. Tenney's name was still a subsisting claim against the company. The decree denied to Jeffery any right of participation as a stockholder until all other stockholders, not parties to the fraudulent scheme, had received the market or actual value of their stock.

The court removed Pomeroy as a receiver and appointed Benjamin R. Ray in his place, and held against the claim of damages under the injunction granted complainant June 1, 1886, and dismissed the suggestions of damages, and modified the order dissolving the injunction by adding thereto a clause restraining the defendant obligees in the bond from maintaining, at any time thereafter, any action of law or suit in equity on said bond. Complainant was given leave to amend the prayer of its bill by making it a bill in behalf of all other creditors and stockholders who may come in and contribute to the expense of the suit. All other questions were reserved for the coming in of the master's report.

From this decree all of the judgment creditors and Jeffery prayed appeals. Robbins' and Tenney's appeals were heard as one case in the Appellate Court. Mrs. Jeffery

does not seem to have perfected her appeal, and sued out a writ of error.    Hayden, Cottrell & Sons, and the Tyler Paper Company assigned separate cross-errors, but none of them were considered, the court not regarding the decree as to them as final.

The Appellate Court reversed the decree of the Circuit Court as to Robbins and Tenney, and directed the dismissal of complainant's bill as to them.    (35 Ill. App. 512.)    The J. W. Butler Paper Company brings the case here by writ of error.    The Appellate Court, in Mrs. Jeffery's case, reversed the decree of the Circuit Court as to her, and remanded it back with special directions to the Circuit Court. (See 37 Ill. App. 96.)    The J. W. Butler Paper Company brings the case here by appeal.    Hayden and Cottrell & Sons have also assigned errors in this court in both of the cases.

We have thus given the facts relating to the organization, management and discontinuance of the John B. Jeffery Printing Company.    They embrace the facts out of which this litigation, in all its branches, has arisen.    Long as the statement is, the record contains other facts that would throw additional light on some of the many questions presented.    We have given those only that we deemed important to a proper view of the relations between the printing company and the other parties to the record, and from which their respective legal rights may be ascertained.

It is insisted that there was a want of jurisdiction in the Circuit Court to entertain the complainant's bill.    We think this objection is not well taken.    The printing company was incorporated under the general act of April 18, 1872, and had ceased doing business, leaving debts unpaid, and complainant was one of its creditors and stockholders, and, under section 25 of said act, had the right, we think, to file this bill.    In *Hunt* v. *LeGrand Roller Skating Rink Co.*, 143 Ill. 118, this court said: "It is provided in said section that suits in equity may be brought against a cor-

poration and its stockholders, and all persons liable in any way for the debts of said corporation, but it is not stated, in express terms, by whom such suits in equity may be prosecuted. It is manifest, however, that the statute provides a remedy in the nature of a creditor's bill, and is designed to aid creditors in the collection of their debts.'' *Wheeler* v. *Pullman Iron and Steel Co.*, 143 Ill. |197; *Alling* v. *Wenzel*, 133 id. 264; *Chicago Mutual Life Indemnity Ass'n* v. *Hunt*, 127 id. 257; *Mining Co.* v. *Mining Co.*, 116 id. 170; *Coal and Mining Co.* v. *Coal and Mining Co.*, 111 id. 32; *Coal and Mining Co.* v. *Edwards*, 103 id. 472. We think, however, that the objection to the jurisdiction of the court has been waived. *Crawford* v. *Schmitz*, 139 Ill. 564.

It is the settled law of this State that corporations may prefer creditors. Their corporate property is not held in trust in such sense as to forbid them giving judgment notes, confessions of judgment or mortgages, or doing any other matter or thing in the exercise of the right they have to prefer one creditor to another. (*Reichwald* v. *Hotel Co.*, 106 Ill. 439; *Ragland* v. *McFall*, 137 id. 81; *Warren* v. *First Nat. Bank*, 149 id. 9; *Peterson* v. *Brabrook Tailoring Co.*, 150 id. 290.) Individuals may prefer creditors, and so may corporations; but in the case of corporations there are, in such preferential transactions, and in all others for that matter, two or more persons concerned beside the person preferred, namely, the corporation itself, and he who acts for it or in its name. The right to prefer belongs to the corporation, and must be exercised, on its behalf, by the proper person or persons duly authorized, and under proper circumstances. The exercise of the right becomes illegal whenever the detriment of the corporation is thereby sought. Those persons to whom the corporation entrusts the exercise of its right to prefer creditors must execute the trust in the utmost good faith, without regard to the extent of their personal interest in the corporation or its

property. The fact that the corporation is embarrassed with indebtedness, or is well nigh or wholly insolvent, does not lessen the duty to exercise with fairness the power given them. They represent the corporation. They represent no one else. They have no right to join hostile creditors or hostile stockholders in a raid on the corporation or upon the corporate property; and incitement to adverse action is not less inconsistent with their duties. Their attitude must be, at all times, on the side of the corporation, otherwise they cease to represent it. Between it and its enemies there is no middle ground for them to occupy. The giving of preferences may, in one sense, damage, injure or practically destroy the corporation; but such results are incidental, and not objective, in contemplation of law.

The John B. Jeffery Printing Company was organized and began business with property and assets worth probably less than half of the amount of its capital stock, which was $150,000, and purported to be fully paid up. The stock was, very probably, good stock to sell or exchange at par for real estate, printing presses, paper, ink, etc. At all events those persons who took it in exchange for such property found that it was good to sell but not to buy at par. Jeffery, better than any one else, knew the value of this stock. His estimate or opinion of its value and desirableness as an investment is clearly shown in the disposition he made of his wife's stock and of that of his father-in-law. He took Michigan avenue real estate for 150 shares of her stock within a few weeks after the organization of the company. Within a week or two afterward he transferred 76 shares in part payment for five printing presses worth $15,-150, reserving the right, which we do not think he ever expected to exercise, to buy back the stock at par at any time before the expiration of two years. From time to time other shares of his wife's stock were disposed of at par for paper, ink and other materials, and before the end of eighteen months from the organization of the company,.

Mrs. Jeffery, through the agency and management of her husband, had practically ceased to be a stockholder in the company.

But one of the chief features of these sales or exchanges of stock was the fact that for every sale or transfer of stock by her, after the exchange of 150 shares for real estate, Mrs. Jeffery received the company's demand judgment note for the par value of her stock, bearing eight per cent interest. These demand judgment notes amounted at one time to about $60,000, and on about the 19th of May, 1886, they amounted to $52,873.89. They represented alleged loans of money, but chiefly transfers of stock, by her to the company, and by it to dealers for materials and supplies for the use of the company.

We may well inquire whether or not this change from the ownership of $40,000 to $50,000 of undesirable stock to an ownership of $40,000 to $50,000 of perferred indebtedness against the company was merely one of the incidents of trade, or was the result of a matured plan, systematically carried on and to a pre-determined end. Was it not seen, from the outstart, that it was better for her to be a creditor than a stockholder? If it was not, why did she take, at her husband's instance, so much stock, and so soon and so persistently manage to get rid of it for perferred interest-bearing demands against the company? She became a creditor through the instrumentality of her stock. The stock was no doubt taken and used so as to convert her into a creditor to an amount grossly in excess of the value of her stock. The dealings between her and the company were carried on by her husband, as the representative of both, and the facts and circumstances disclosed in the record justify the inference that she was probably made a stockholder that she might become a creditor.

We can find nothing in Jeffery's transactions with Hayden, and with C. B. Cottrell & Sons, that can serve to modify the conclusion we draw from his management of his

wife's dealings with the company. They rather strengthen than weaken that conclusion. It may be that Hayden and the Cottrells were not entitled to a rescission of their contracts with the company, but what took place between them and Jeffery has an important bearing on the question of Jeffery's plans and purposes, as charged in the bills filed against him.

Waiving all questions as to the adoption of the resolution of April 19, 1884, authorizing Jeffery to borrow not exceeding $50,000 at any one time, and to secure the payment of the same by judgment notes, mortgages or otherwise, we remark that the power given should be construed with strictness. (*Frye* v. *Jones,* 78 Ill. 627; *Keith* v. *Kellogg,* 97 id. 147; *Campbell* v. *Goddard,* 117 id. 251; *Gardner* v. *Bunn,* 132 id. 403; *Little* v. *Dyer,* 138 id. 272.) It was a power to borrow money. The power to secure the money borrowed was broad. The broad power given to execute judgment notes, mortgages and other securities was limited to the one thing,—borrowing money. The power to borrow money did not embrace power to buy stock in the company, or other corporate stocks, or printing presses, paper, ink and other materials for the company. The resolution would seem to have been a declaration to the effect that except for the purposes of borrowing money, judgment notes should not be given. This power would not extend to debts already created on the general credit of the company, so as to authorize the giving of judgment notes, unless the transaction, in effect, amounted to a borrowing of money. But it is to be understood, of course, that unauthorized acts of officers of corporations may be ratified, and that a known course of dealing on their part may bind the corporation, though beyond their powers. This power to borrow money was given to Jeffery as president of the company. It might borrow from his wife, but for him to act for the company as borrower and for his wife as lender, or for the company as buyer of its own

stock and for his wife as seller of its stock, would place him in an embarrassing attitude to both of them and to the law. As agent for his wife, and agent and president of the company, he could not deal between them to the best advantage of both.

"A trustee may not put himself in a position in which to be honest must be a strain on him." (*Staats* v. *Bergen*, 2 C. E. Green, 554; *Tyler* v. *Sanborn*, 128 Ill. 136.) In the latter of these cases this court said: "There is, moreover, apart from this pecuniary interest, an intimacy of relation and affection between husband and wife, and of mutual influence of the one upon the other for their common welfare and happiness, that is absolutely inconsistent with the idea that the husband can occupy a disinterested position, as between his wife and a stranger, in a business transaction. He may, by reason of his great integrity, be just in such a transaction; but unless his marital relations be perverted, he can not feel disinterested,—and it is precisely because of this feeling of interest that the law forbids that he shall act for himself in a transaction with his principal. It is believed to be within general observation and experience, that he who will violate a trust for his own pecuniary profit, will not hesitate to do it, under like circumstances, for the pecuniary profit of his wife." *Lagger* v. *Mutual Union Loan Ass'n*, 146 Ill. 283.

Early in 1886, Jeffery, as agent for his wife, employed Tenney to take charge of her demands against the company, of which he was the president. As president, he took the company's money to pay the retainer required from his wife for services to be rendered against the company. As agent for his wife, his duty required him to explain to her attorney, whom he had selected, all the facts and circumstances relating to the origin and condition of her demands against the company, and to acquaint him with all matters out of which hostile action might probably arise. This was his duty, and in performance thereof he showed Ten-

40—151 ILL.

ney the contract with Cottrell & Sons, and other like contracts, a number of weeks before May 19, 1886. He informed him fully of Hayden's grounds of complaint, and of his attitude towards the company. He gave him all information necessary to proper advice as to the course or courses to be pursued. Neither of them supposed that Hayden could do more than any stockholder in any company could do who held but one-tenth of the stock. They did not fear Hayden; and as for Cottrell & Sons, whose contract they had examined with care, and who owned but 76 shares, they knew that their claim that they were creditors was a "very thin" one, and that their attorney had admitted to them that it was thin. They knew that the chief grounds of complaint on the part of Hayden and the Cottrells were, that Jeffery had deceived and defrauded them. Danger was impending from no other source, and in the opinion of both of them the danger from that source was insufficient to cause any alarm. In the interview with the attorney of Cottrell & Sons, it was suggested to him that the printing company might pay one-half of their alleged demand, or $3,800, but he was not given time to report the suggestion of compromise to his clients. The twenty-four hours' notice asked of him, and granted, before his institution of proceedings against the printing company, were diligently employed in working the resolution of April 19, 1884, to its full capacity for turning out more demand judgment notes, and in the entry of judgments by confession, the suing out and levy of executions on everything leviable, so that when the twenty-four hours had elapsed, it was found that the time had been asked for, not for purposes of attempting a compromise, but to the end that the plans, already matured, might be carried fully into effect. It was conceded that this attorney was designedly made to believe one thing when another was intended, and it is claimed, presumably, that such conduct in behalf of clients is legitimate; but how, in a court of

equity, we are to get over such things, except in a blind, staggering way, is not generally understood.

The bank's ninety day note, with power to sell the collateral, was exchanged for a demand judgment note. Burr Robbins, to whom, it is probable, less than $1,000 was due, had his account been adjusted, received through his attorney, Tenney, a demand judgment note for $5,000. The W. O. Tyler Paper Company, to whom nothing was due, but which was liable as endorser on seven notes, as above stated, received a demand judgment note for $22,758.50. The resolution of April 19, 1884, adopted when the company was starting in business, authorizing the borrowing of money, was made at this time to do its most effective service, not so much for borrowing money for the company as for helping it on to its end.

Tenney must have known that Jeffery had already, if not long since, lost sight of the company's interests and of his relation to it, and that every step he took and every power he exercised seemed to be in the interests of two or three creditors, one of whom was his wife. His eyes were open to the fact that the president of the company had turned upon it, and was seeking, not its interests, but its destruction. It is no answer to say Tenney was not responsible for Jeffery's conduct, for there seems to have been such co-operation between them that it is difficult to believe that their purposes were widely different. Tenney knew what Jeffery was doing, knew what he wanted, and the end reached seems to have been the end for which they both assiduously labored.

A peculiar feature of these transactions presents itself here. Jeffery had employed and paid Tenney to act for his wife. She held judgment notes for nearly $53,000,— more than twice the amount of the bank's debt. He was his wife's agent and the agent for Robbins, and as such could rightfully control Tenney. But it is claimed that they disagreed as to what should be done. Jeffery believed

there was no need for present action.    Tenney took another view of the matter; but Jeffery knew the situation better than he, and was, besides, the superior in authority.    The power to give judgment notes was, or had been, lodged in him alone.    Tenney knew this.    He represented the bank, but the bank's note would not be due for almost ninety days, and Mrs. Jeffery's notes in its hands as collateral were not subject to sale until that time had elapsed.    The W. O. Tyler Paper Company, liable only as endorser, could do nothing for two or three months to come.    Hayden and the Cottrells were the only persons that had threatened anything.    Hayden was not feared at all, and it was not thought worth while to wait to ascertain whether the Cottrells would take fifty cents on the dollar, which would have amounted only to $3,800.    And so, we remark, that had Jeffery made an issue with Tenney on the necessities of the situation, we do not see what the latter could have said in favor of immediate and precipitate action.

The claim that Jeffery disagreed with Tenney as to what should be done, and declined at first to deliver to him Mrs. Jeffery's notes, the Robbins note and other securities, is in strange contrast with his conduct before and after this opposition, or show of opposition, to Tenney's plans.    His agency for his wife, so well kept in mind before, seems now to have been forgotten in the presence of the attorney whom he had employed for her and over whose employment he had full control.    Jeffery was not over-persuaded.    He was already quite willing.    The action taken was in line with that had in contemplation by him, we think, many months before that time.    The events that followed each other so rapidly after the afternoon of May 19, 1886, when the confessions of judgment were entered, throw a strong light on those that preceded that date.    Those happening before and those after that time so fit together and consist with each other, that, in the light of the evidence, we are constrained to say they were parts of one plan, and for its

existence and the method of its execution the demands and threats of Hayden and the Cottrells do not furnish sufficient reason or excuse.

The property of the company, its leasehold interests, contracts, etc., were sold to Tenney for $75,000 in judgments, —an amount equal to but one-half of the capital stock of the company,—and within a few weeks this same property was valued at $186,927.29, and was turned over by him, for the sum of $150,000, to a new company formed in the lifetime of the old one, and standing ready to receive its property and effects. These and very many other things might be cited as tending strongly to establish the conclusion above indicated. Nor do the circumstances attending the formation of the new company, under the management of Gage and receiver Pomeroy, throw any favorable light on the beclouded precedent transactions. Beginning with the interview with Cottrell & Sons' attorney, and ending where Gage turned over the new corporation, with its acquisitions, to the persons to whom it belonged, chief among whom was, it is claimed, Mrs. Jeffery, we find a series of transactions productive of remarkable results. We have given only a part of them. They might be grouped together, in fuller confirmation of our view, but we do not deem it necessary, considering the length of this opinion.

The testimony heard before the chancellor touching the sworn charges of fraud as made in the creditors' bills; the statements under oath that prior statements, also under oath, were unguardedly or inadvertently made; the admissions in answers to certain questions and the refusal to answer questions; the failure of persons to testify who were more deeply interested than all other persons, without apparent reasons for so refusing,—these and a number of other like matters were before the chancellor, and had more or less weight, no doubt, in determining the questions of fraud and conspiracy. We think the rule of this court, to the effect that the court or chancellor seeing and hearing the

witnesses when testifying is to be considered a better judge of the value and weight of their testimony than the reviewing court, should be applied in this case.

The entry of judgment on the bank's demand in the name of Tenney has served no good purpose. Its effect was to make him a necessary party to this litigation. If, on the 19th of May, 1886, the bank held a demand judgment note for $25,000, and also two other like notes of Mrs. Jeffery, for $35,000 and $5,000, respectively, endorsed by her to it without recourse, we see no reason why judgment was taken on the first note in Tenney's name, and on each of the other two in Mrs. Jeffery's name. It was a small matter that the bank did not want to appear in court. Legal proceedings should, ordinarily, be carried on in the names of the interested litigants. The entry of judgment in Tenney's name has, perhaps, had the effect of removing the bank one step further from, and of bringing Tenney one step nearer to, the main controversy in this suit; and while these may be their rightful positions, in one sense, yet, considering who has been the gainer by reason of the actions complained of, their positions should be reversed. The decree of the court should take effect upon the bank first, and afterward, if at all, upon its attorney. The bank obtained satisfaction of its demand through the instrumentality of proceedings held by the court to be fraudulent and void as to other creditors. The organization of the new company, and the methods adopted to obtain the money due, are not so far removed from or so disconnected with the main ground of complaint as to entitle them to be considered apart from it instead of a part of it. The cash came to its hands by means of transactions in stock of the new company. To what extent those transactions were real or unreal, we can not say. Their outward appearance, however, is not favorable.

We do not deem it necessary to enter into a discussion of other matters connected with this branch of the case. We

think the requirements of equity will be more fully met by holding that nothing shall be taken, directly or indirectly, under or by virtue of those six confessions of judgment, or any or either of them, of May 19, 1886.

The Burr Robbins eight per cent judgment note for $5,000, dated December 31, 1885, was executed by Jeffery as president of the company, and was in Jeffery's hands May 19, 1886. If it ever took effect or became a valid note before its delivery to Tenney on that day, as attorney for Robbins, Jeffery must have delivered it, as president, to himself, as agent for Robbins. We do not desire to treat this matter with unnecessary technicality, but we think that Jeffery's agency for Robbins, and his exercise of power under the resolution of April 19, 1884, which had long ceased to serve the purposes for which it was presumably adopted, forbid any great indulgence of presumptions. Jeffery's agency for so many parties and in so many matters is already one of the chief features of this case. Besides, there is much evidence tending to show that Robbins was entitled to judgment for less than one-fifth of the sum for which judgment was entered, and that the company's books were changed to prevent the discovery of that fact.

We have considered the cases of Albert Hayden and C. B. Cottrell & Sons in connection with other branches of this controversy, and without passing upon the question of their right to assign errors on the records in the Appellate Court and this court, we deem it sufficient to say that we agree with the Circuit Court as to the measure of relief to which they are entitled. In the light of Hayden's connection with the company, and of the written contract of May 1, 1884, between Cottrell & Sons and the printing company, we do not see how we can hold that they possess any other rights than those of stockholders. They were, very probably imposed upon, but to admit them to be creditors on an equal footing with those persons who are conceded to be creditors of said company, would be to establish a very unwise precedent.

The right to prefer creditors is an infirmity still remaining in the body of the common law. It is contrary to the letter and spirit of the maxim that equality is equity. It is condemned in all our State insolvent laws. The Federal bankrupt laws have never omitted to annex penalties to its exercise. It makes our law in relation to voluntary assignments a poor, lame piece of legislative work, intended only for debtors who desire to deal fairly with their creditors. It is the result, very often, not of the voluntary choice of debtors already weak and discouraged, but of persistent and harassing importunities or of flattering promises which often amount to fraudulent bargains. Creditors may accept preferences, but they can not accept them in consideration of promises, express or implied, to further the plans of the debtor to hinder, delay or defraud other creditors. The law favors the diligent and active creditor, but it warns him that he can enter into no bargain or plan the object of which is not the collection of his own debt solely, but in part the defeat of some one else equally worthy with himself.

We think the evidence sustains, with one or two exceptions, all of the more material findings of the Circuit Court.

The judgments of the Appellate Court in the two above entitled causes are hereby reversed, and said causes are remanded to the Circuit Court. The decree of the Circuit Court is also reversed, but only to the end that the same may be so modified as to provide that the assets, tangible and intangible, of the John B. Jeffery Printing Company, or the proceeds thereof, or that which stands in the place of said assets, including that which may be collected from persons who may be liable therefor or for the value thereof, shall be distributed ratably among all those persons whom the court may find were creditors of said company on the said 19th day of May, 1886, and whose demands may be found to be still subsisting; but those creditors who have received, in money or property, or in the equivalent

thereof, through the instrumentality of proceedings under said judgments, more than their proper *pro rata* shares, shall be required to refund or pay only so much as may be necessary to effect an equalization of payments to or receipts by creditors. The court should ascertain, as near as may be, the value of the whole of said assets on said day, but the parties chargeable may be charged with the value of the said assets, or with the proceeds thereof, as may seem best to serve the ends of justice. The court should require all those creditors, including said bank, who have obtained payment or satisfaction of their demands, in whole or in part, by means of the proceedings aforesaid, wherein or whereby said assets were disposed of, to make payment of the proper sums or amounts for purposes of equalization, as above required, and, so far as it may be proper to do so, resort may be had to the refunding bonds given in compliance with the decree. The bank's lien on said judgment notes for $35,000 and $5,000, endorsed to it by Mrs. Jeffery without recourse, shall remain unaffected, so far as said notes may have been shown to be legal demands, in its hands, against said company.

These directions are given to the Circuit Court, not to indicate how it should proceed, but to point out the end to which its action should be directed, namely, the distribution of the said assets of the said corporation among its creditors, and the remainder thereof, if any, among the stockholders of said company in the manner and according to the priorities indicated in the said decree.

The judgments of the Appellate Court and the decree of the Circuit Court are reversed, and the cause is remanded to the Circuit Court for further proceedings in conformity with this opinion. It is ordered that Albert Hayden and C. B. Cottrell & Sons pay the costs made by them, respectively, in this court, and it is ordered that the other costs in this court be paid, in the appeal case, by Emma J. Jeffery, and in the other case by D. K. Tenney and Burr Robbins.

*Judgment reversed.*