FIRST NAT. BANK OF SALEM *v.* SALEM CAPITAL FLOUR-MILLS Co. *et al.*

(*Circuit Court, D. Oregon.* June 17, 1889.)

1. TRUSTS—SALE IN TRUST.
    A sale of property "in trust," *held*, under the circumstances, not to be a sale in trust to pay the debts of the vendor.
2. VENDOR AND VENDEE—VENDOR'S LIEN—ASSIGNMENT—SUBROGATION.
    A grantor's lien on the premises conveyed, for the purchase price, is a personal privilege, not assignable with the debt; nor can the creditor of the grantor be subrogated to the same.
3. CORPORATIONS—PURCHASE OF THEIR OWN STOCK.
    In the absence of any statute to the contrary, a corporation may purchase and dispose of its own stock, provided the same is done in good faith, without intent to injure the creditors thereof, and they are not injured thereby.
4. SAME—DEEDS—ATTORNEY IN FACT.
    An attorney of a corporation must execute a deed in the name of his principal, but under his own hand and seal.
(*Syllabus by the Court.*)

Suit to Foreclose the Lien of a Mortgage.

*Tilmon Ford,* for plaintiff.

*William B. Gilbert,* for defendant Stuart.

*John M. Bower,* for defendants Kelly and McDonald.

DEADY, J. This suit is brought by the First National Bank of Salem, hereafter called herein the "Salem Bank," to enforce the lien of a mortgage given by the Salem (Oregon) Capital Flour-Mills Company, hereafter called herein the "Scotch Company," to secure the payment of its note for $30,000.

William Stuart, who held a prior mortgage on the same property, executed by the City of Salem Company, hereafter called herein the "Oregon Company," to secure the payment of $71,940, with interest, was made defendant. He appeared, and filed a cross-bill, in which he admitted the claim of the plaintiff, and asked to have the lien of his mortgage enforced.

Joseph Kelly and R. McDonald were also made defendants, the former being a British subject, and the latter a citizen of Rhode Island, on the ground that they pretend to have some interest in the property, as the judgment creditors of the Oregon Company.

The case was before the court on a demurrer of the defendants Kelly and McDonald to the cross-bill of the defendant Stuart, when the demurrer was overruled.    31 Fed. Rep. 580.

Thereafter the defendant Stuart died, and the cross-bill was revived in the name of Hugh Lyon, Alexander Stuart, and others, the executors of the will of the deceased.

In the fullness of time the case was put at issue and heard on the amended bill, the cross-bill, and the revivor thereof, the answers of the defendants Kelly and McDonald, the replications thereto, and the testimony taken before an examiner.

From these it appears that on and before August 2, 1883, the Oregon Company was and still is a corporation formed under the laws of Oregon, with its principal place of business at Salem; that on said day said corporation in pursuance of a resolution of its directors made and delivered its promissory note to the defendant William Stuart, a British subject, and a resident of Scotland, for the sum of $71,940, payable on August 1, · 1888, with interest at 9 per centum per annum, payable half yearly, for which interest 10 additional notes were given at the same time, and made payable accordingly, with interest thereon at 10 per centum per annum after maturity ; and at the same time, and in pursuance of the like authority, said corporation duly executed and delivered to said Stuart, as a security for the payment of said principal and interest, a mortgage on its real property, situate in and about Salem, Marion county, Or., including its flour-mills and Santiam water privileges; and also a mortgage on some village lots and parcels of land in Polk county, Or.

The resolutions of the directors, providing for the making of these notes and the execution of these mortgages, state that "it is considered to the best interests of the corporation to buy in and obtain 654 shares of its own stock, now held by the following persons," naming them, 15 in number; that "it is necessary to raise upon its [the corporation's] credit $71,940, to pay for said stock;" and they authorize and direct "the president and secretary" of the corporation to borrow that amount from the defendant Stuart, and give him its notes and mortgages therefor, as was done.

The actual circumstances out of which this transaction arose are as follows:    The capital stock of the corporation consisted of 2,000 shares of the par value of $100 each, of which it does not appear how many was ever issued.    William Reid was a large shareholder in the corporation, and the president and manager of the same from its formation.    The owners of the 654 shares of the stock became dissatisfied with his management, and determined to sell out or buy a controlling interest in the corporation.    At this juncture, about May 1, 1883, the defendant Stuart, who was also a large shareholder, arrived in Oregon from Scotland, and after canvassing the subject it was agreed, on June 2d, between himself, Reid, and others holding a majority of the stock, that the "discontents" should be bought out on account of the corporation at $110 a share, payable on August 2d following.    But, when the parties came to close the bargain, the sellers refused to take the obligation of the president and

secretary of the corporation for the money, but insisted on having the personal guaranty of the defendant Stuart. This he at first flatly refused, but after much persuasion and serious hesitation he consented; the president assuring him that before the day of payment came around the shares could and would be re-sold in this market for the amount, and the obligation thereby discharged.

Soon after Mr. Stuart returned to Scotland, but the shares were not sold, and he was compelled to advance the money to pay the debt. The corporation kept the shares, and gave him the notes and mortgages as aforesaid.

On March 24, 1844, the directors of the Oregon Company resolved to dispose of all their real property, as well as the wheat, flour, and grain sacks on hand, to the defendants Stuart and James Tait, also of Scotland, or their assignees, upon payment of the actual cost price of the same, "as soon as said price could be ascertained, or within a reasonable time thereafter; the president and secretary to execute and deliver the proper conveyances for that purpose at the time of payment of said sum so to be ascertained."

Afterwards, on April 17, 1884, said directors affirmed this resolution of sale in favor of James Macdonald, of Scotland, as purchaser, at the suggestion of said Stuart and Tait, that he would take the property in trust for the Scotch Company, then being formed by themselves and others under the British Companys act of 1862; and, further, that said Macdonald, either by himself or agents, should have the right to inspect the books, papers, and accounts of the Oregon Company, for the purpose of ascertaining the first cost of its property.

On April 28, 1884, at a meeting of the stockholders of the Oregon Company, at which 1,001 shares were present and voting, there being 1,179 then issued, the resolutions passed at the directors' meetings of March 24 and April 17, 1884, authorizing the sale of the property of the corporation to James Macdonald, were unanimously ratified and confirmed, and the prior mortgage of the same to the defendant Stuart was also "confirmed, ratified, and approved."

Thereafter, on June 6, 1884, at a meeting of the directors of the company, the real property of the corporation was scheduled and valued at $230,694.68, and the personal property, less "the book debts and accounts," which were not sold, at $164,023.36, in all $394,718.04; and at a meeting of said directors, held on July 8, 1884, at which were present James Tait, director, and Alexander Stuart, agent, of the Scotch Company, it was resolved, that inasmuch as said agent does not admit the correctness of the cost of certain items of the property as stated in said schedule, and it has been agreed between the directors of the Oregon Company and the said agent and director of the Scotch Company that said items shall be referred for final adjustment to a committee of two persons from each company, at Edinburgh, William Reid, and William Stuart to act for the Oregon Company; that, on payment by said agent of $70,054.63 on account of said purchase, the president and secretary do make the necessary conveyances of the property, subject to

the adjustment to be made by said committee, and to the payment of the mortgage of the defendant Stuart.

On July 10, 1884, the Oregon Company, by its deed, duly executed by William Reid, its president, and William N. Ladue, its secretary, conveyed the property in question to James Macdonald, of Edinburgh, Scotland, "in trust" for any corporation that might be organized to take and hold the same. The deed purports to be made in pursuance of the resolutions passed at the meetings of the directors held on March 25 and April 17, 1884, and the resolution passed at the meeting of stockholders held on April 25, 1884, and for the consideration of $220,000, the receipt whereof is thereby acknowledged.

On August 12, 1884, a meeting of the stockholders of the Oregon Company was held, at which 1,022 shares of the stock were voted, there being then 1,201 issued, when the action of the directors at the meeting of July 8, 1884, in the matter of the adjustment of the cost of certain items in the schedule of the property of the corporation, and the execution of the deed to James Macdonald by the president and secretary, were unanimously ratified and approved.

On December 16, 1884, said James Macdonald duly conveyed the property to the Scotch Company. The deed recites that the property was purchased for the Scotch Company, and conveyed temporarily to Macdonald "as its trustee, the consideration for the same having moved wholly from the said" Scotch Company, and that it is the object of the conveyance to transfer "the legal title" to the same to the Scotch Company and its assigns.

On February ———, 1887, the Scotch Company duly executed its mortgage to the defendant Stuart, on a tract of land near Salem, containing five acres, more or less, and particularly described in the amended cross-bill as a further security for the loan theretofore made by said Stuart to the Oregon Company; it having been the intention of the parties thereto that such property should be included in the mortgage from said company to said Stuart, from which it was omitted by inadvertence.

On November 17, 1886, the Scotch Company, being in the possession of the property aforesaid, duly executed and delivered its mortgage upon the same to the plaintiff, the First National Bank of Salem, Or., and a citizen of said state, by Robert Livingstone, of Portland, therein, its attorney in fact, in pursuance and by authority of a power of attorney to him duly executed by said company on September 2, 1886, to secure the payment of its note of even date therewith for the sum of $30,000, and payable one day after date to the order of said bank, with interest at 10 per centum per annum, subject, however, to the prior lien of the mortgage thereon, theretofore executed by the Oregon Company to the defendant Stuart, to secure the payment of $71,940, with interest, the payment of which the mortgagor declares it has assumed. This note was given for prior advances made to the Scotch Company by the Salem Bank, with the approval of the bank examiner.

On August 14, 1885, the directors of the Oregon Company, William Reid, A. Shaw, and S. M. Elliott voting in the affirmative, and William

N. Ladue in the negative, passed a resolution stating that the corporation was indebted to the Oregon & Washington Mortgage Savings Bank of Oregon, a corporation formed under the laws of Oregon, and called herein the "M. & S. Bank," in various sums theretofore advanced by the latter, that then exceeded $33,000, and directing the president, William Reid, and the directors Shaw and Elliott, to make and deliver to said M. & S. bank, on behalf of the Oregon Company, one promissory note for $20,000, and another for $12,000, payable in three days after date.

At this time, and before and since, William Reid was a large stock holder in, and the president and manager of, the M. & S. Bank. The notes were given as directed, the one for $20,000 on August 14th, and the one for $12,000 on the 17th of the same month, and some time after their maturity the former was transferred to the defendant McDonald, and the latter to the defendant Kelly, without, so far as appears, any consideration therefor.

On August 25, 1885, Kelly commenced an action on the note held by him in the circuit court of the state for the county of Multnomah, in which, on April 3, 1886, he obtained a judgment against the Oregon Company for the sum of $12,771.50, principal, attorney's fee, and costs, with interest on the principal from August 17, 1885, at the rate of 9 per centum a year.

On October 18, 1886, McDonald commenced an action in the same court on the note held by him, in which, on December 6, 1886, he obtained a judgment against the Oregon Company for the sum of $14,-369.22, principal, attorney's fee and costs, with interest on $14,071.60 of the same from date. Both judgments were duly docketed in the lien dockets of the circuit courts of Multnomah and Marion counties, prior to December 25, 1886, and executions issued on the same, and returned *nulla bona*.

The defendants, Kelly and McDonald stand in the shoes of the M. & S. bank, whom they simply represent.

They claim that their demands are a lien on this property prior in time and superior in right to that of the Salem Bank or the defendant Stuart, on the following grounds:

1. That the conveyance to Macdonald of July 10, 1884, was in trust that he or his grantee would pay the existing debts of the Oregon Company, and thereby "the property was impressed with a trust" to pay the same.

There is not a syllable of evidence in the case to support this claim. On the contrary, it is clear that the conveyance to James Macdonald was made "in trust" only, that he would in due time convey the property to the Scotch Company, which was then being formed for the purpose of owning it, by the persons who negotiated the purchase.

It appears probable that at the time of the sale the Oregon Company was in debt to the M. & S. Bank for advances, and doubtless it was expected that the former would pay the same, with the proceeds of the sale of its property to the Scotch Company. But the amount of the indebtedness has never been ascertained, and the agent of the Scotch Com-

pany was prevented by the manager of M. & S. Bank from taking a copy of the account from the books of the same for the purpose of examination.

By the terms of the conveyance the Scotch Company assumed · the payment of the Stuart debt, then amounting to over $78,000, and at the delivery of the same it appears that the agent of the company paid over in cash $77,134.20, which was largely applied by the manager on the claim of his bank; and, although the resolution of the corporation authorizing the sale directed that the deed should be delivered on the payment of the consideration, yet the parties, being unable to agree on the value of certain items of the properties embraced in the conveyance, and valued in the schedule at $10,431, the deed was delivered, with the understanding that when the balance was ascertained by the joint committee of the two companies that was to meet at Edinburgh in a short time, it would be paid.

Before the committee met, however, there was a considerable loss on a shipment of flour which appears to have been afloat at the time of the delivery of the deed. The committee of the Scotch Company insisted that this flour was not on hand at the time of the purchase, having been heretofore shipped against advances drawn thereon largely in excess of the proceeds of its sale, and therefore the loss must fall on the Oregon Company. The committee of the latter company, William Reid, claimed that the flour, by the terms of sale, passed to the Scotch Company, and that it was liable for its then value, less the advance, and must stand the loss; and, because the committee of the Scotch Company would not accede to this proposition, he refused to further attend the meetings of the committee, and left this and the other disputed items unsettled, as they still remain, so far as appears.

In the annual report of the president and directors of the Oregon Company to the stockholders, dated October 5, 1885, it is stated that nine months before the corporation, under the advice of the president, had offered to the Scotch Company, by way of compromise, to bear $20,000 of the loss, which was believed to be over one-half thereof, and that the latter company, not having accepted the proposition, it was withdrawn by the directors on August 14, 1885, and a friendly suit commenced in this court "to determine the various matters in dispute between the two companies." How much, if anything, is still due to the Oregon Company from the Scotch Company it is impossible to say on this evidence. In the balance-sheet of the latter for June 30, 1886, among the liabilities then existing there is this item: "City of Salem Company, balance purchase price of properties, $39,360.11."

There was a contemporaneous agreement between the Scotch Company and the larger portion, if not all, the shareholders of the Oregon Company, that their shares should be exchanged at their actual value for shares of the former at par, which, so far as carried into effect, would discharge the indebtedness of the former to the latter, and was so intended and understood at the time of the sale.

In admitting that the Scotch Company is indebted to the Oregon Com-

pany, the M. & S. Bank is merely an unsecured creditor of the latter company and has no lien or privilege on the property sold by its debtor to the Scotch Company. The M. & S. Bank was only an unsecured creditor when its debtor sold this property to the Scotch Company, which took the same without any liability, express or implied, to pay any of the grantor's debts, except the one due Stuart, that was already a charge on the land.

And if the debt of the M. & S. Bank had even been assumed by the Scotch Company, the mere fact that it was prior in point of time to the debt of the Salem Bank would not give it any right to priority of payment. In the absence of a bankrupt law or statute to the contrary, a debtor may prefer one creditor to another, at his pleasure.

If the Scotch Company is indebted to the Oregon Company, a creditor of the latter may by proper proceedings subject such indebtedness to the satisfaction of his claim, but he has no right in the property of the former as against the lien creditors thereof.

2. Assuming that some portion of the purchase price is still unpaid, the Oregon Company has a grantor's lien on the property for the amount, to which the defendants Kelly and McDonald are entitled in equity to be subrogated to the extent of their demands against the grantor.

The existence of such a lien is admitted in this state. *Road Co.* v. *Crocker*, 6 Sawy. 574, 4 Fed. Rep. 577; *Gee* v. *McMillan*, 14 Or. 268, 12 Pac. Rep. 417; 3 Pom. Eq. Jur. §§ 1249, 1250. But assuming that the Oregon Company has a grantor's lien on the property for unpaid purchase money, the weight of opinion in the United States is that such lien is personal to the grantor, and incapable of being transferred, either by direct assignment or equitable subrogation. 3 Pom. Eq. Jur. § 1254; *Baum* v. *Grigsby*, 21 Cal. 173.

In the latter case Mr. Chief Justice FIELD, speaking for the court, says of a grantor's lien:

"It is simply a right to resort to the property upon a failure of payment by the vendee. It does not arise from any agreement of the parties, but is the creature of equity, and is established solely for the security of the vendor. It is founded upon the natural justice of allowing a party to reach the property which he has transferred to satisfy the debt which constitutes the consideration of the transfer. It is therefore the personal privilege of the vendor. The assignee of a note given for the purchase money stands in a very different position. He has not parted with the property which he seeks to reach in consideration of the note he has received. He has never held the property and has therefore no special claims upon equity to subject it to sale for his benefit. The particular equity of the vendor in this respect cannot, in the nature of things, be asserted by another."

The M. & S. Bank is not even the assignee of a debt alleged to be due the Oregon Company from its grantee. In England and a few of the states of the Union, such an assignee may enforce the grantor's equity. But it does not appear that a mere creditor of such grantor can be subrogated to this right in any of the United States. 3 Pom. Eq. Jur. § 1254.

3. The mortgage to Stuart is void, because the indebtedness it was given to secure arose in fact out of a purchase by the Oregon Company of its own stock from Stuart.

The rule appears to be well settled in the United States that a corporation may, unless prohibited by statute, purchase its own stock, or take it in pledge or mortgage. *Bank* v. *Bruce*, 17 N. Y. 510; *Taylor* v. *Exporting Co.*, 6 Ohio, 176; *In re Insurance Co.*, 3 Biss. 452; *Bank* v. *Transportation Co.*, 18 Vt. 138; *Clapp* v. *Peterson*, 104 Ill. 26; *Dupee* v. *Water Power Co.*, 114 Mass. 37; Cook, Stocks, §§ 311, 312.

In the case cited from 104 Ill. the rule is stated qualifiedly as follows:

"Corporations may purchase their own stock in exchange for money or other property, and hold, reissue, or retire the same, provided such act is had in entire good faith, is an exchange of equal value, and is free from all fraud, actual or constructive; this implying that the corporation is neither insolvent nor in process of dissolution," and that the rights of creditors are not thereby injuriously affected. In the case cited from 114 Mass. the court says: "In the absence of legislative provision to the contrary, a corporation may hold and sell its own stock, and may receive it in pledge or in payment in the lawful exercise of its corporate powers."

As a matter of fact, the transaction in question was not a purchase of the stock by Stuart, and a resale by him to the corporation. It was a purchase of the stock by the corporation through its directors, with intent to reissue the same, and a guaranty of payment of the purchase price to the sellers, by Stuart. The subsequent note and mortgage was given to Stuart, in consideration of the amount he had to pay on his guaranty. At the date of the purchase, the corporation appears to have been solvent. It was much more than able to pay its debts. The stock was sold above par, and the motive in selling was not so much to get rid of it, or the property and business which it represented, as a settled dissatisfaction with the management of William Reid. As evidence of this it appears that the discontents offered "to sell or buy,"—to take the stock of Reid and his associates at the same figure.

The only creditor that the corporation appears to have had at the time was the M. & S. Bank, and its president and manager was a party to this transaction, and urgent and active in its accomplishment. The purchase of the stock did not injuriously affect the interest of this creditor, nor was it so intended. It was made in good faith, to acquire the control of a valuable property free from the dissensions arising from the personal distrusts and antipathies of a dissatisfied faction of the stockholders.

Neither, in my judgment, is a purchase of stock by a corporation, even when made under circumstances or for purposes that make it voidable, generally and absolutely void, but only as against those who are injured by it, and in some proper and timely proceeding seek redress against it.

The defendants Kelly and McDonald claim to be the assignees of the M. & S. Bank, which was a creditor of the Oregon Company at the time of the purchase of the stock, but they do not allege or prove any circumstance that tends to show that the purchase was made in bad faith towards their assignor, or with intent to injure it, or that it was thereby injured.

That the stock of the Oregon Company afterwards depreciated in value on account of losses sustained on shipments of flour, or that the debtor

of the corporation, the Scotch Company, thereafter became insolvent from like causes, does not affect the character of the transaction, or the rights of the parties thereto.

And even admitting that the Oregon Company was insolvent at the date of the mortgage, the situation of the parties was simply this: Stuart was a creditor of the corporation for money advanced for it, and the M. & S. Bank was nothing more. There being no statute to the contrary. The corporation had a right to prefer the one to the other, which it did, by giving Stuart security on its property.

4. It is not shown that the Scotch Company authorized "the making" of the mortgage to the Salem Bank, or that the seal of the corporation was affixed thereto; and said mortgage was given for a pre-existing debt, with knowledge that the mortgagor owed the Oregon Company, the debtor of the defendants, $86,892.04.

Livingstone, the agent of the Scotch Company, had a power of attorney under its seal, authorizing him to deal with this property as he saw proper, and this was sufficient authority for the execution of this mortgage. The mortgage does not profess to be the act of the corporation in person, so to speak. It is the deed of its attorney, a natural person, and is therefore well executed when signed and sealed by the latter. The seal of the corporation is affixed to its deed, the power of attorney, on which the validity of the mortgage ultimately rests.

The M. & S. Bank never had any interest in or lien on this property, nor even any pecuniary demand against the Scotch Company, and therefore it is altogether immaterial that the plaintiff's mortgage was given for a pre-existing debt, with knowledge of an existing demand of the M. & S. Bank against the Oregon Company.

But for the earnest manner in which these latter objections to this mortgage are urged, they would not have been deemed worthy of consideration.

And, lastly, if the Oregon Company was a defendant in this suit, it could not by means of an answer, and without a cross-bill, assert the claim made here by Kelly and McDonald, that it had a grantor's lien on this property, or that the Scotch Company took the same in trust, or "impressed" with a trust, to pay the debts of the former. An answer is a means of defense, and not attack. It is a shield, and not a weapon. Resort must be had to a cross-bill in such case. Langd. Eq. Pl. § 115 *et seq.*

There must be a finding that the Scotch Company is indebted to the plaintiff in the sum of $30,000, with interest from November 17, 1886; and to the defendant Stuart in the sum of $71,940, with interest from August 2, 1884; and that the mortgages given by the Oregon and Scotch Company, as set forth in the amended and cross-bill herein, to secure the payment of said indebtedness, are valid first liens on the property therein described in the order of their execution; and that the same be sold by the master of this court, and the proceeds applied to the satisfaction of the same, with the costs and disbursements of this suit.