COLEMAN et al. v. TEPEL.

(Circuit Court of Appeals, Third Circuit. March 2, 1916.)

No. 2069.

1. CORPORATIONS ⬅︎376—POWERS—PURCHASE OF OWN STOCK.

When an insolvent corporation purchases its own stock, or where the effect of such a purchase is to render it insolvent, the transaction is void as to creditors in those jurisdictions which uphold the right of a corporation, in the absence of statutory prohibition, to expend its capital in good faith for the purchase of its own stock, as well as in those jurisdictions which hold such a purchase to be inherently illegal.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1530; Dec. Dig. ⬅︎376.]

2. CORPORATIONS ⬅︎569—POWERS—PURCHASE OF OWN STOCK.

In a suit to set aside a mortgage, evidence *held* to show that, when a corporation purchased 180 of its 255 shares of stock and gave a mortgage on its plant for the indebtedness thereby created, it was thereby rendered insolvent, whether solvent or insolvent prior to the transaction.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1916; Dec. Dig. ⬅︎569.]

⬅︎For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. EVIDENCE ⊜‑‑113(13)—ADMISSIONS—VALUE OF PROPERTY—COMPROMISE OF INSURANCE CLAIM.

The amount of insurance placed upon property is no evidence of its value; but the amount paid and accepted pursuant to an insurance adjustment is some evidence of the value of the property destroyed, when the amount paid is less than the face of the policies.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 279; Dec. Dig. ⊜‑‑113(13).]

-4. CORPORATIONS ⊜‑‑542(1)—POWERS—PURCHASE OF OWN STOCK.

Where a corporation was rendered insolvent by purchasing its own stock and giving a mortgage for the indebtedness thereby created, the transaction was void as to subsequent as well as prior creditors, though there was no fraudulent intent, since, when a stockholder, with the knowledge he has, or with that with which he is charged concerning the corporation's financial condition, engages in a transaction depleting for his advantage the corporate assets below the subscribed capital or existing liabilities, and becomes a party to the solvent appearance of a business intended to be continued, he is bound by his act both to existing and future creditors, when the result is the insolvency of the corporation and injury to creditors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2154, 2159; Dec. Dig. ⊜‑‑542(1).]

Appeal from the District Court of the United States for the Middle District of Pennsylvania; Chas. B. Witmer, Judge.

Suit by Fred W. Tepel, trustee in bankruptcy of the West Branch Box & Lumber Company, against John J. Coleman, individually and as trustee, and others. From a decree in favor of plaintiff (229 Fed. 300), defendants appeal. Affirmed.

Wm. Russell Deemer and N. M. Edwards, both of Williamsport, Pa., for appellants.

Mortimer C. Rhone and A. R. Jackson, both of Williamsport, Pa., for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. The questions in this case relate to the validity of a purchase by a corporation of its own shares of stock. The theory upon which the case was argued involved a general consideration of the broad subject of corporate capital, the purposes for which it is employed and held, and the rights of creditors and stockholders therein. An excursion into this general subject was deemed necessary, because it was thought that some phases of the case are controlled by laws of Pennsylvania, with respect to which, we are informed, there is neither statutory nor judicial expression. As we view the case, many of the questions so elaborately argued and seriously considered are subordinate to what we deem to be the controlling questions. These relate to the solvency of the corporation at the time it purchased the stock, and to the insolvency of the corporation as a consequence of the purchase. These questions we believe may be decided upon general principles of law applicable in Pennsylvania as elsewhere, thereby leaving the courts of Pennsylvania unembarrassed by our decision when they are called upon to declare the law of Pennsyl-

vania upon such questions, as, whether the capital of a corporation is a trust fund for the benefit of creditors; whether capital, as distinguished from surplus, may be employed by a corporation, when solvent, to purchase its stock and reduce its capitalization; whether in determining solvency, capital is to be computed as a liability; and whether capital stock is a property consideration that will support a valid corporate obligation, within the meaning of Article 16, Section 7, of the Constitution of Pennsylvania.

The undisputed facts out of which arose this controversy are these: John Coleman owned and operated in Lycoming County and State of Pennsylvania a small plant for the manufacture of boxes. In view of its size and the amount of capital invested, the business was prosperous, yielding annual net profits of about $6,000. R. C. Hartman and C. H. McLaughlin, young men in Coleman's employ, desired to purchase the business. After negotiations, it was sold to the West Branch Box and Lumber Company, a corporation organized by them, for the sum of $30,000.

Capital stock to the amount of $25,500 was subscribed, for which 255 shares, at the par value of $100, were issued, as follows: John Coleman, 50 shares; D. J. Bright, 50 shares; William F. Campbell, 10 shares; R. C. Hartman, 50 shares; C. H. McLaughlin, 15 shares; E. W. Cole, 5 shares; John C. Lush, 25 shares; John J. Coleman, 50 shares.

The first five, in the order named, were elected directors. John Coleman was elected president.

The subscribers paid for their shares in cash, excepting Campbell, who gave his note for $400. Before beginning business, the corporation borrowed from the local Board of Trade $10,000, secured by a first mortgage on the plant. With its cash capital and with a portion of the money borrowed, the corporation paid John Coleman the purchase price of $30,000. With its entire capital and $4,500 of borrowed money invested in its plant, the corporation began business on February 1, 1911, and excepting for profits earned, it thereafter conducted business entirely upon credit.

The business for the fiscal year 1911 was good, yielding a net profit of about $6,000, out of which a six per cent. dividend was paid. The balance remained in the business. The profits for the fiscal year 1912 were a little uncertain, it being testified that they were between $5,000 and $7,000, but as the corporation had expended about $7,500 for improvements during the two years, no money was available for dividends.

Hartman and McLaughlin were the active directors in the conduct of the business. Their policy of installing new machinery, contracting working capital, extending bills payable, as well as the inability of the corporation to reduce its loans and to pay a dividend for the year 1912, caused dissatisfaction among certain stockholders. Upon the disclosure of the condition of the business at the annual meeting in January, 1913, John Coleman and Bright, stockholders and directors, and John J. Coleman, Cole and Lush, stockholders, expressed a desire to sell their stock and get out of the business. The three remaining di-

rectors and stockholders, Campbell, Hartman and McLaughlin, were willing but were financially unable to make the purchase. After many conferences extending through the months of February, March and April, 1913, it was agreed that the corporation should purchase the stock of John Coleman, John J. Coleman, Cole and Bright, aggregating 155 shares, and in consideration therefor should deliver to John J. Coleman, trustee for himself and the others, its second mortgage for $15,500 secured by $12,000 fire insurance. When this agreement was reached, John Coleman resigned from the presidency of the corporation and he and Bright resigned from the board of directors on May 1, 1913, and on May 5, 1913, the transaction was completed by the remaining directors. Lush apparently conducted his own negotiation for the sale of his stock, which was consummated a few days later by the delivery of the corporation's judgment note for $2,500 in return for his 25 shares. The mortgage and the judgment were duly recorded.

The effect of these transactions was to increase the indebtedness of the corporation $18,000 and to diminish its outstanding stock to $7,500. The financial condition of the corporation for the periods preceding and succeeding the transaction will presently be considered. The plant burned on February 13, 1914, resulting in a total loss. It was insured for $22,500, $10,500 of which was held as security on the mortgage to the Board of Trade, and $12,000 as security on the mortgage to Coleman, trustee. After a dispute between the mortgagees and the insurance companies, an adjustment was effected by which the Board of Trade received $8,238 and Coleman, trustee, was awarded $9,915. Pending the insurance adjustment, the corporation was adjudged bankrupt. Its trustee obtained an order from the court below restraining the payment of the insurance money to Coleman, trustee. The money was afterwards paid into the registry of the court. Thereupon the trustee in bankruptcy filed the bill in this case under section 70e of the Bankruptcy Act of 1898 (Act July 1, 1898, c. 541, 30 Stat. 565 [Comp. St. 1913, § 9654]), to avoid the transaction of the purchase of stock and to annul the mortgage given therefor, thereby raising the question whether the fund in court is payable to the trustee in bankruptcy or to the trustee under the mortgage.

In his view of the case, the learned trial judge did not find it necessary to consider or decide the question of the corporation's insolvency either at the time of the stock purchase or as a consequence of it. In finding for the complainant, he held that the bond and mortgage given by the corporation in the purchase of its own stock were void, because they created a fictitious increase of the corporation's indebtedness and were not based upon a property consideration within the meaning of Article 16, Section 7, of the Constitution of the State of Pennsylvania, which provides:

"No corporation shall issue stocks or bonds except for money, labor done, or money or property actually received; and all fictitious increases of stock or indebtedness shall be void."

We prefer to leave to the courts of Pennsylvania the interpretation of this constitutional provision, and to decide this case upon other

principles. Our inquiry will be directed to the solvency of the corporation at the time it purchased its stock, and to the effect of that purchase upon its solvency. In thus considering the case, we feel that we can eliminate many questions submitted to us for decision which do not properly arise from the facts.

Two inconsistent doctrines have obtained currency as to the legality of a purchase by a corporation of its own stock; one, that it is inherently illegal, the other, that it is legal save under circumstances producing injury.

The doctrine that it is inherently illegal prevails in England, and to a limited extent in this country. A. & W. B. & C. A. v. Smith, 141 Wis. 377, 382, 123 N. W. 106, 32 L. R. A. (N. S) 137, 135 Am. St. Rep. 42; In re Clark, 40 Am. L. Reg. (N. S.) 398, 424. It rests upon the theory that the capital of a corporation is a trust fund for the payment of corporate indebtedness, Columbian Bank's Estate, 147 Pa. 422, 436, 23 Atl. 625, 626, 628; Hamor v. Taylor-Rice E. Co. (C. C.) 84 Fed. 393; Upton v. Tribilcock, 91 U. S. 45, 47, 23 L. Ed. 203; Sanger v. Upton, 91 U. S. 56, 60, 23 L. Ed. 220; Crandall v. Lincoln, 52 Conn. 73, 94, 52 Am. Rep. 560; that the reduction of its capital by the purchase of its stock is ultra vires, Hamor v. Taylor-Rice E. Co., supra; Maryland Trust Co. v. Bank, 102 Md. 608, 63 Atl. 70; Farrington v. Tennessee, 95 U. S. 679, 686, 24 L. Ed. 558; Central Transp. Co. v. P. P. C. Co., 139 U. S. 24, 481, 11 Sup. Ct. 478, 35 L. Ed. 55; and that such a purchase is a fraud upon creditors in that it diverts corporate assets from creditors to persons who have no claim upon them, Hall v. A. T. & I. Co., 143 Ala. 464, 39 South. 285, 291; Lowe v. Pioneer I. Co. (C. C.) 70 Fed. 646; Cook on Corporations, §§ 311, 312.

The doctrine that the purchase of stock by a corporation is legal save under circumstances producing injury, is based upon the theory that capital is not a trust fund; that a solvent corporation may employ its capital in the purchase of its own stock, when not prohibited by law, so long as it acts in good faith. A. & W. B. & C. A. v. Smith, 141 Wis. 377, 382, 123 N. W. 106, 32 L. R. A. (N. S.) 137, 135 Am. St. Rep. 42, and cases cited; First National Bank v. Salem C. F. M. Co. (C. C.) 39 Fed. 89, 96, and cases cited; In re Smith Lumber Co. (D. C.) 132 Fed. 618; Dupee v. Water Power Co., 114 Mass. 37; Cook on Corporations, §§ 311, 312.

[1] Upon which of the two theories rests the law of the State of Pennsylvania with respect to the right of a solvent corporation to employ its capital in the purchase of its own stock is not necessary for us to determine in this case, for whatever may be the theory of the law of Pennsylvania in that regard, it is certain that in Pennsylvania, as elsewhere, when an insolvent corporation purchases its own stock, Columbian Bank's Estate, 147 Pa. 422, 436, 437, 23 Atl. 625, 626, 628; Hamor v. Taylor-Rice E. Co. (C. C.) 84 Fed. 392; A. & W. B. & C. A. v. Smith, supra; or where the effect of such a purchase is to render it insolvent, the transaction is void as to creditors. A. & W. B. & C. A. v. Smith, supra; German Saving Bank v. Wulfekuhler, 19 Kan. 60; Butler P. Co. v. Robbins, 151 Ill. 588, 38 N. E.

153; Currier v. Lebanon S. Co., 56 N. H. 262; Alexander v. Relfe, 74 Mo. 495; Augsburg L. & I. Co. v. Pepper, 95 Va. 92, 27 S. E. 807; Hall v. Terminal I. Co., 143 Ala. 464, 39 South. 285, 2 L. R. A. (N. S.) 130, 5 Ann. Cas. 363; In re Smith Lumber Co. (D. C.) 132 Fed. 620, 13 Am. Bankr. R. 123, 125; Clapp v. Peterson, 104· Ill. 26; National Bank v. Burch, 141 Ill. 519, 31 N. E. 420, 33 Am. St. Rep. 331; Buck v. Ross, 68 Conn. 29, 35 Atl. 763, 57 Am. St. Rep. 60; Cook on Corporations, § 311.

In those jurisdictions which hold that a solvent corporation is without power to purchase its own stock, it necessarily follows for the same and other reasons, that the purchase of stock by an insolvent corporation is illegal. In the jurisdictions which uphold the right of a corporation, in the absence of statutory prohibition, to expend its capital in good faith for the purchase of its own stock, the courts have most definitely held to and rigidly enforced the collateral principle that a corporation cannot make such a purchase when it results in fraud upon the rights of creditors.

[2] With this general statement of the law, let us inquire whether the West Branch Box and Lumber Company was solvent when it purchased from Coleman and his associates its own stock, and, if solvent, whether it was rendered insolvent by that purchase.

The testimony upon this subject was mainly given by those who had been stockholders and directors of the corporation, and in one way or another had been parties to the transaction. In many of its features, the testimony is irreconcilable, and being based upon recollection and opinion rather than upon records, presents difficulties.

The first act of the corporation was to purchase the business and the plant from Coleman for $30,000. As the subscribed capital was not equal to the purchase price, the corporation borrowed $10,000 from the local Board of Trade, securing the same by a first mortgage. With something over $4,500 of the money borrowed and with its entire subscribed capital of $25,500, it paid for the business and plant. If stock be included as a liability, the corporaiton was insolvent when it began business, as its liabilities exceeded its assets by about $5,-500. If stock be not so included, then the company relied solely upon borrowed money for working capital, and was in financial peril at its very start. Its working capital was quite inadequate. It therefore made purchases and borrowed money upon the credit of John Coleman, and upon credit alone obtained funds with which it did business until it made earnings.

At or before the annual meeting in January, 1913, all the stockholders had a statement of the business for the fiscal year 1912, which indicated that no dividend would be paid. Certainly on February 1, 1913, they knew that the corporation was financially unable to pay its mortgage debt to the Board of Trade, which had been reduced to $7,000; that it was unable to pay its notes upon which Coleman and others were endorsers, amounting to about $14,700, or to discharge its accounts payable amounting to about $4,100, without encumbering or selling its plant. They also knew that the corporation was endeavoring to secure from the Board of Trade, and afterwards suc-

ceeded in obtaining, a return of the $3,000 which it had paid on account of the principal of the mortgage.

In this condition of the corporation's finances, John Coleman, John J. Coleman, Bright, Cole and Lush became dissatisfied, and after negotiations between them and the three remaining stockholders and directors, their stock was purchased and the mortgage and judgment given as previously stated. Aside from knowledge of the corporation's condition on February 1, 1913, all the parties to the stock transaction knew that on May 5, 1913, when the stock was purchased and the mortgage delivered, the liabilities of the corporation had grown, and exceeded its liabilities of February 1, 1913, by about $7,800. Recognizing the corporation's inability to pay its outstanding obligations, the stockholders, including those who were about to retire, made an agreement with the corporation for the extension of the loans and the renewal of the notes upon which they were endorsers, covering a long term of years, indicating at that time not only an insufficient amount of working capital, but a total financial inability to pay its current debts. Between May 5, 1913, and October following, the financial condition of the company grew worse, until in the latter month it had exhausted its available resources. The $5,000 of accounts receivable shown on May 5, 1913, had been consumed. The business was ended by fire in February, 1914.

Being thoroughly familiar with the financial condition of the corporation, we are satisfied that in proposing an exchange of stock for the corporation's obligation, Coleman and his associates attempted to protect themselves against threatened, if not impending, disaster.

Notwithstanding the general decline of the corporation's business, begun several months before and continuing after the stock purchase transaction, the corporation was not insolvent if we accept as correct the figures given by its officers covering the different periods of its existence. But the company's alleged solvency is based upon figures, some of which, upon their face, cannot be accepted. The assets with respect to accounts and bills receivable, cash, lumber, finished and unfinished products, and liabilities with respect to accounts and bills payable and mortgage indebtedness, must be accepted as given. The difficulty, however, arises out of the valuation placed upon the plant, which includes land, buildings of all kinds, and machinery.

It was testified that in negotiating for Coleman's business, the purchasers estimated the value of the plant at $30,500, that the price paid for the whole business, including the plant, was $30,000, and that no allowance was made in the purchase price for the acquisition of the business as a going concern. The defendants therefore maintain that at the time of the purchase on February 1, 1911, the plant was worth at least $30,000. In view of the fact that Coleman sold a business that was paying him $6,000 a year, we do not believe that he disposed of it at the value of the physical property. Therefore, the plant must have been worth something less than $30,000.

On February 1, 1913, the corporation submitted a statement of its affairs to the Board of Trade in its endeavor to secure a return of the $3,000 it had paid on account of its mortgage. In that statement the

plant was included at $37,032. This sum just about represents the original value of the plant as estimated by the purchasers, plus the improvements that had been put upon it during two years, without charging off anything for depreciation. At the trial, officers of the corporation who made the statement to the Board of Trade on February 1, 1913, estimating the value of the plant at $37,032, placed its value on May 5, 1913, three months thereafter, at $43,600. Others testified that it was worth $51,000. These differences reflect simply the opinions of different witnesses and are not based on values of additions or improvements. They are inflations.

[3] The amount of insurance placed upon a plant is no evidence of its value, but the amount of money paid and accepted pursuant to an insurance adjustment is some evidence of the value of the property destroyed, when the amount paid is less than the face of the policies. The plant was insured for $22,500, and the insurance adjustment amounted to something over $18,000. One of the appraisers for the fire loss was McLaughlin, who estimated upon and reported the value of the property at the time of its purchase by the corporation.

It would add nothing to this opinion to repeat the calculations by which we have arrived at our conclusion. It is sufficient to say that by deflating the estimated value of the plant from $51,000, $43,000 and $37,000 to something approximating its value, as indicated by its original cost with the added costs of improvements, and as indicated by the amount received from insurance as an acceptable adjustment of the value of the property destroyed, we find that on May 5, 1913, before the delivery of the Coleman mortgage and the Lush judgment, the corporation was solvent, if we exclude its stock from its liabilities, and that it was insolvent if we include its stock as a liability. It is not necessary for us to determine in this case, whether, in ascertaining solvency under the law of Pennsylvania, stock should be included as a liability, for we find that immediately after the delivery of the Coleman mortgage and the Lush judgment, by which the stock was reduced to $7,500 and the general liabilities increased from $33,700 to $51,700, the corporation was insolvent whether the stock liability be included in or excluded from the calculation, and therefore whether the company was or was not solvent on May 5, 1913, when it gave the mortgage to Coleman and the judgment to Lush, it was made insolvent by those transactions.

[4] It has been urged that if the transaction is void it is void only as to existing creditors and not as to those with whom the corporation subsequently incurred obligations, upon the ground, that to avoid a transfer of property in fraud of future creditors, there must be present actual intent to defraud. Sommermeyr v. Schwartz, 89 Wis. 66, 71, 61 N. W. 311; Case v. Phelps, 39 N. Y. 164. With this principle evidently in mind, there was controversy at the trial as to whether certain debts were created prior or subsequent to the stock purchase. Unquestionably many debts created prior to the transaction were proved in bankruptcy. Others were subsequently incurred. We are inclined to hold, upon the reasoning of well considered authorities, that the void character of such a transaction as to future creditors does not

depend upon fraudulent intent, and that when a stockholder, with the knowledge he has or with that with which he is charged concerning the financial condition of the corporation, engages in a transaction which results in a depletion for his advantage of corporate assets below the subscribed capital or below existing liabilities, as the law may be, and becomes a party to the solvent appearance of a business that is intended to be continued, he is bound by his act both to existing and future creditors, when its direct object or immediate consequence is the insolvency of the corporation and injury to creditors. A. & W. B. & C. A. v. Smith, supra; Maryland Trust Co. v. National Bank, supra; Hamor v. Taylor-Rice E. Co., supra.

The decree below is affirmed.