### E. H. Johnson, Trustee, Appellant, v. Canfield-Swigart Company et al., Appellees.

### Gen. No. 23,653.

1. CORPORATIONS, § 197*—*when stockholder paid for stock out of corporate funds liable to subsequent creditors.* A stockholder who disposes of his stock with knowledge that the money received in payment thereof is taken from corporate funds, resulting in a depletion of the capital stock of the company, and with the further knowledge that the company is to continue doing business, will, in the event that the company afterwards becomes insolvent, be held accountable for the money thus received to creditors who subsequently extend credit to the company in ignorance of the fact that such depletion of the capital stock has thus taken place.

2. INTEREST, § 19*—*when not allowed on unliquidated demand.* Where a stockholder was paid for stock transferred out of the cor-

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

porate funds, the trustee in bankruptcy of such corporation suing to recover the amount so diverted is not entitled to interest from the date of the transaction, as until the insolvency of the company the liability of the defendant was purely contingent and the amount was unliquidated until the claims of all the creditors were filed against the bankrupt estate, the assets thereof converted into cash and the exact amount of the deficiency ascertained.

Appeal from the Superior Court of Cook county; the Hon. MARTIN M. GRIDLEY, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1917. Reversed and remanded with directions. Opinion filed June 14, 1918.

FRED H. ATWOOD, CHARLES O. LOUCKS and VERNON R. LOUCKS, for appellant.

HARRY A. BIOSSAT, for appellees Canfield-Swigart Co., George W. Swigart and Charles J. Canfield.

MR. JUSTICE McDONALD delivered the opinion of the court.

This appeal brings up for review an order dismissing appellant's bill of complaint for want of equity.

The bill was filed by E. H. Johnson, as trustee in bankruptcy of the estate of the Turnbull-Joice Lumber Company, bankrupt, against the Canfield-Swigart Company, a corporation, George W. Swigart, Charles J. Canfield, Charles C. Young, William H. Turnbull and John K. Joice, and sought for the benefit of its creditors to compel the return of capital amounting to approximately $50,000 alleged to have been wrongfully and fraudulently diverted from the treasury of the said company.

The cause was referred to a master in chancery for hearing, who recommended that a decree be entered against the Canfield-Swigart Company for the sum of $28,049.70, and against Charles J. Canfield for the sum of $7,812.88, being the amounts so received by them respectively. Exceptions to the master's report were sustained by the court and the bill of complaint dismissed for want of equity as to the said two last-

named defendants.  During the pendency of the suit the said Turnbull and Young died, and no one having been substituted in their stead, the suit abated as to them.  What disposition was made of the suit as to the said Joice and Swigart personally the record does not reveal nor is any point made thereon by either party.

The undisputed evidence shows that in May, 1905, the Turnbull-Joice Lumber Company was incorporated under the laws of the State of Illinois, with a capital stock of $50,000, divided into 500 shares of the par value of $100 each; that on July 8, 1907, the said capital stock stood on the books of the company in the names of the following persons:

William H. Turnbull .................... 71 shares
Charles C. Young ....................... 52
George W. Swigart, as trustee for the Can-
    field-Swigart Company ...............259
John K. Joice .........................118;

that the stock appearing in the name of the said Joice was originally paid for with money advanced by the said Canfield and was immediately assigned and delivered to him by the said Joice, as security for the money so advanced; that on and prior to the said last-mentioned date the officers of the Turnbull-Joice Lumber Company were as follows:  William H. Turnbull, president; John K. Joice, vice president; George W. Swigart, secretary; and Charles J. Canfield, treasurer; that on said date negotiations theretofore carried on between the said Joice, acting on his own behalf, and the said Swigart, acting on behalf of the said Turnbull, Young and the Canfield-Swigart Company, culminated in an agreement by the terms of which the said Joice agreed to purchase all of the capital stock of the said company—including the 118 shares standing in his name but which had been assigned to and were being held by Canfield as aforesaid—for the sum of $53,-188.81, this being the amount agreed upon by the said

parties as the fair cash value of the stock at that time.

The evidence further shows that the said Joice paid for this stock with funds taken from the treasury of the Turnbull-Joice Lumber Company, procured in the following manner: Joice, on behalf of the company, borrowed $30,000 from a Chicago bank, giving the company's notes therefor, $27,930.85 of which he turned over to Swigart in part payment of the said stock, whereupon Swigart delivered to him all the capital stock of the Turnbull-Joice Lumber Company. The remainder of the purchase price was collected from the Ouachita Lumber Company, a corporation which was indebted to the Turnbull-Joice Lumber Company in the sum of $25,257.96. The evidence shows that the Canfield-Swigart Company advanced this amount to the said Ouachita Lumber Company to enable it to pay its indebtedness to the Turnbull-Joice Lumber Company, and for the express purpose of supplying the balance of cash necessary to complete the said stock purchase, and that it was actually used for that purpose.

The evidence further shows that on said date a meeting of the board of directors of the Turnbull-Joice Lumber Company was held, at which the then officers and directors of said company tendered their respective resignations, whereupon new directors and officers were elected, Joice becoming its president; that thereupon the newly-elected board of directors declared a 100 per cent. dividend on its capital stock, which Joice acknowledged receipt of, this being the money withdrawn from the treasury of the company and used in payment of the stock purchased by him as aforesaid; that thereafter the company, though still solvent, had barely sufficient assets to pay its existing indebtedness; that it continued doing business for upwards of 2 years thereafter, when it became insolvent, with liabilities aggregating upwards of $80,000 over and above its

assets; that the creditors on whose behalf this bill was filed did not become such until some time after July 8, 1907, and that they extended credit to the company without notice of the aforesaid transaction.

The vital question here presented for determination is, whether or not under the aforesaid circumstances subsequent creditors of the company who had no notice thereof can attack such a transaction. This precise question has never been passed upon by our Supreme Court.

A situation somewhat analogous to the one now confronting this court arose in *Taylor v. Ziegenhagen,* 131 Fed. 232. In that case all the capital stock of the Haas Company, a corporation organized under the laws of the State of Illinois, was sold and the transfer to the purchasers thereof made. To secure the notes given to evidence the indebtedness due on the purchase price of the stock so transferred, a chattel mortgage upon the assets of the corporation was given to the vendors. Subsequently the company was adjudged a bankrupt, and it was sought by the mortgagee under the chattel mortgage to gain preference as a creditor under such mortgage. The reviewing court, in denying such claim, held that "unless shareholders may invade, at will, the capital and assets of the corporation, appropriating them with impunity to the payment of their individual debts, the transaction complained of by the trustee cannot be sustained"; that "shareholders may, * * * out of the assets of the corporation, declare and pay dividends; or, the affairs of the corporation being wound up, divide among themselves its capital and assets; but dividends mean the division not of capital and assets as such, but of earnings; and a final division of capital and assets means that the corporation will invite no further credit"; that so long as the company is a going concern there can be no lawful division of assets and capital that would impair the rights of existing and future cred-

itors and that would diminish the security upon which continuing or future credit would be presumably based.

In *Mackall v. Pocock* (Minn.), 161 N. W. 228, the question presented for review was, whether or not dividends paid to the stockholders out of the paid-in capital of a corporation, at a time when the company had made no profits, owed debts but was nevertheless solvent, could be recovered by a trustee in bankruptcy for the benefit of creditors without notice, whose claims arose after the payment of such dividends. The court, in upholding such right, used the following language, p. 230:

"Defendant received assets of the corporation to which he was not entitled. Subsequent creditors, who trusted the corporation in ignorance that its capital had been impaired by the payment of these dividends, are entitled to recover on the ground of fraud, not actual fraud but constructive fraud, fraud in law."

To the same effect is *Coleman v. Tepel*, 230 Fed. 63, a case very much in point, wherein the court held, pp. 70, 71:

"We are inclined to hold, upon the reasoning of well considered authorities, that the void character of such a transaction as to future creditors does not depend upon fraudulent intent, and that when a stockholder, with the knowledge he has or with that with which he is charged concerning the financial condition of the corporation, engages in a transaction which results in a depletion for his advantage of corporate assets below the subscribed capital or below existing liabilities, as the law may be, and becomes a party to the solvent appearance of a business that is intended to be continued, he is bound by his act both to existing and future creditors, when its direct object or immediate consequence is the insolvency of the corporation and injury to creditors."

See also, *Atlanta & W. Butter & Cheese Ass'n v. Smith*, 141 Wis. 377, 123 N. W. 106; *Brenaman v. Whitehouse*, 85 Wash. 355; *Maryland Trust Co. v. National Mechanics' Bank*, 102 Md. 608.

It will be noted from an examination of the foregoing authorities, that some of the courts predicate liability upon the theory that the capital stock of a corporation is a trust fund for the payment of its corporate debts and that the shareholders of the corporation are charged with notice of the trust character which attaches to it; that they are, to all intents and purposes, privies to the trust and hold the stock subject to all equities which attach to it, irrespective of whether there were fair dealings or actual or constructive fraud between the parties or fraudulent intent on their part in so doing,—which theory still obtains in this State (*Olmstead v. Vance & Jones Co.,* 196 Ill. 236, and cases there cited). Others base it upon the doctrine that shareholders receiving dividends the payment of which depletes the capital of the corporation, which afterwards becomes insolvent, are guilty of a constructive fraud as to creditors who became such subsequently thereto.

In our opinion, a stockholder who disposes of his stock with knowledge that the money received in payment thereof is taken from corporate funds, resulting in a depletion of the capital stock of the company, and with the further knowledge that the company is to continue doing business, should, in the event it afterwards becomes insolvent, be held accountable for the money thus received to creditors who subsequently extend credit to the company in ignorance of the fact that such depletion of the capital stock has taken place.

In arriving at this conclusion, we are not unmindful of the fact that the authorities on this question are inharmonious. However, we shall not prolong this opinion with an analysis of them. Suffice it to say that in our opinion the conclusion here reached conforms to the trend of modern authority.

The further point is made by appellant, that in the event appellees are held liable, interest should be al-

lowed on the respective sums received by them, from July 8, 1907.

It will be seen that up to the time the Turnbull-Joice Lumber Company became insolvent the liability of the appellees was purely contingent and the amount thereof was unliquidated until the claims of all creditors were filed against the bankrupt estate, the assets thereof converted into cash and the exact amount of the deficiency ascertained. It appears that the deficit was determined and demand made upon the appellees for the return of the moneys received by them respectively, immediately before the institution of this suit, which was begun December 28, 1911. Interest should therefore be computed and allowed from said last-mentioned date.

Accordingly the order dismissing the bill of complaint will be reversed and the cause remanded with directions to enter a decree as hereinabove outlined.

*Reversed and remanded with directions.*